Melvin HAIFETZ, and Harvey Walters, a minor by his mother, and natural guardian Rose Walters

v.

Frank RIZZO and City of Philadelphia.

Civ. A. No. 25972.

United States District Court
E. D. Pennsylvania.

Dec. 9, 1959.

Theodore R. Mann, Philadelphia, Pa., for plaintiffs.

Samuel C. Tabbey, Philadelphia, Pa., for defendant Frank Rizzo.

Jacob J. Siegal, Deputy City Solicitor, Philadelphia, Pa., for City of Philadelphia.

CLARY, District Judge.

This is an action brought by plaintiffs Melvin Haifetz and Harvey Walters, a minor, against defendants, Frank Rizzo, then Commanding Officer of the Nineteenth Police District of Philadelphia, located at 12th and Pine Streets, Philadelphia, Pennsylvania, and the City of Philadelphia itself, for an injunction and damages under the provisions of Title 42 U.S.C.A. § 1983 (1957), which Act is generally referred to as the Civil Rights Act. Under its provisions any one who claims the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States by any person acting under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, may maintain an action at law, suit in equity, or other proper proceeding for redress of such wrongs.

Melvin Haifetz from approximately June of 1958 owned and operated the Humoresque Coffee Shop, located at 2036 Sansom Street, Philadelphia, Pennsylvania, wherein coffee, tea, cafe expresso and pastries were sold and served to the customers. According to the complaint and the testimony at the hearings, the customers were encouraged by the plaintiff Haifetz to engage in games of chess with equipment provided by him; to read magazines and books provided by him and his customers; to listen to classical music played on a high-fidelity recorder provided by him, and to engage in literary discussions and compose original prose and poetry, some of which was displayed on a bulletin board maintained by Haifetz in the premises for that purpose and for the purpose of posting notices of forthcoming "cultural events" throughout the City of Philadelphia. The complaint alleges a series of mass raids on the establishment and its customers by defendant Rizzo which resulted in a denial of the right of Haifetz and his customers to peaceably assemble with others in the premises maintained by him; denial of the right of such persons to be secure in their persons, house, papers and

effects against unreasonable searches and seizures; denial of the right of privacy; denial of the right to be secure from false and malicious arrest, imprisonment and prosecution, and denial of the right to speak to counsel in such situations. Further, it is alleged that such actions destroyed the property rights of the plaintiff Haifetz. All of this was allegedly done under color of State law.

The relief requested was a permanent injunction against defendant Rizzo from entering the place without a warrant, unless he had reasonable grounds to believe that a felony had been committed or was being committed therein, interfering with the conduct of the business, or the peaceful assembly of the plaintiff and his customers, interference with the right of privacy, harassing the plaintiff and his customers, and threatening to drive the plaintiff out of business. In addition, Haifetz requested damages against both defendants jointly and severally in the amount of $25,000. Plaintiff Walters, who was arrested in a raid to be discussed hereinafter, asked damages against both defendants jointly and severally in the amount of $15,000.

After a three-day hearing on the preliminary injunction, the Court on the 26th day of March, 1959, filed a memorandum opinion and order, D.C., 171 F. Supp. 654, denying the petition for a preliminary injunction by the plaintiffs against defendant Frank Rizzo, reserving all questions of violation of Constitutional rights to the final hearing. The City of Philadelphia filed briefs and argued its motion to dismiss on the ground that a municipality is not a 'person' within the meaning of the provisions of Title 42 U.S.C.A. § 1983.

At the specific request of counsel for both plaintiffs and defendant Rizzo, decision in the matter was delayed pending discussion of a possible practical solution of the problems involved and, perhaps, an amicable settlement of the disputes between the parties. It having become apparent within the past few weeks that the matter can not be adjusted between the parties, and the parties now having stipulated of record that the testimony given at the preliminary injunction hearing might be considered as on final hearing for the purpose of determining the question of liability, the matter is now ripe for final decision.

Without attempting to refer specifically to the testimony of any particular witness, the overall situation demonstrated by the record made in this case from the inception of Haifetz's purchase of the Humoresque Coffee Shop is as follows. During several months prior to Haifetz's acquisition of the place in June of 1958, a Coffee Shop had been conducted at the premises. Between January of 1958 and June of 1958 the Police had been summoned to the neighborhood sporadically because of noise emanating in and around the Coffee Shop on a few occasions. However, beginning in June of 1958 and continuing until the events which provoked the present litigation, a period from June of 1958 to February of 1959, the Police were called to the location on upwards of twenty-five occasions. These visits were usually occasioned by anonymous telephone calls complaining of disturbances there. In the vast majority of instances when the Police arrived at the place, those creating the disturbance had fled and the Police were unable to make arrests. Haifetz himself on two or three occasions had called the Police for help in quelling disturbances occurring in front of his establishment.

The testimony reveals that on many occasions the Coffee Shop was conducted in an orderly manner. The testimony also shows that regularly throughout the entire period involved under Haifetz's management, the establishment was frequented by minors—boys and girls between the ages of 14 and 21 years, and that it drew its patronage from all parts of the City, rather than the immediate neighborhood. Further, and this testimony is credited and believed by the Court, it became a gathering place of homosexuals and narcotic addicts to the extent that the Police felt it necessary to put undercover operators to observe the meeting of such addicts and thereafter

follow up the activities of those meeting in the Coffee Shop. The record does not demonstrate that there was any sale of narcotics made in the Coffee Shop although the activities which followed at different locations are highly suggestive that it was a convenient place to make arrangements for future transactions to be consummated off the premises.

The neighborhood in which the Coffee Shop is located is a mixed business and residential neighborhood. Almost immediately across the street from the Coffee Shop is a large parking lot which is open twenty-four hours a day with its concomitant noise of operation during the evening and night hours. Near the end of the same block towards Twentieth Street and some distance removed from the Coffee Shop is a taproom. The evidence clearly shows, however, that prior to the inception of the operation of the Coffee Shop, noises were minimal. On occasion there was some noise and horn blowing from the parking lot but these occasions were rare. There was never any noise or complaints of noise about the operation of the taproom. With the advent of Haifetz's operation of the Coffee Shop, however, the situation changed. Young people in the age bracket above set forth were wont to gather together particularly over the weekends at the Coffee Shop. Numerous sport cars would bring the patrons to the Coffee Shop and loud mufflers and racing of motors disturbed the theretofore calm of the street between the hours of 10 p. m. and 1 a. m., seriously interfering with the resident neighbors' sleep. Loud and raucous noises would emanate from groups entering and leaving the Coffee Shop. The alley at the rear of the Coffee Shop was used as a public urinal and loud, profane and obscene language would be heard from those who utilized the alley for that purpose. The Hi-fi would be operated at an exceedingly high tone which likewise disturbed the neighbors and interfered with the enjoyment of their own properties. Sansom Street being a narrow street and parking being difficult because of its narrowness, the patrons of the Humoresque Coffee Shop appropriated the sidewalks of the neighbors as parking places for their sport cars.

As aforesaid, the Police Department had numerous complaints about the operation of the Coffee Shop and about the conditions above outlined. As would be expected, however, upon the appearance of a police car, those creating the disturbance would disappear and upon its arrival at the Coffee Shop the Police would generally find peace and quiet. On one occasion defendant Rizzo, and on several other occasions other Police Officers, remonstrated with plaintiff Haifetz and asked him to cooperate with the Police to bring about the cessation of the objectionable activities. So as to avoid the necessity of police interference, Haifetz was asked to so conduct his business that it would not be objectionable to the rights of the neighbors or the neighborhood to reasonable peace and quiet. This cooperation Haifetz flatly rejected, despite the fact that it was called specifically to his attention that his place had become a hangout for homosexuals and narcotic addicts. There is credible testimony by Captain Rizzo that on one occasion he saw two men immediately after leaving the Humoresque hugging and kissing on the sidewalk of Sansom Street immediately adjacent to the Coffee Shop. There is testimony of another neighbor that on another occasion she saw a similar or similar occurrences. There is no doubt in the mind of the Court that the Humoresque Coffee Shop was so operated as to constitute a public nuisance and this with the full knowledge of its owner Haifetz.

The events leading up to the present litigation are encompassed within a period of approximately three days. On Wednesday, February 11, 1959, at about 9:45 p. m., two Police Officers, Kenneth Powell and Thomas Treherne, went to the twenty-hundred block of Sansom Street and stationed themselves in an automobile on the opposite side of the street near the Coffee Shop and kept the place under surveillance. While so doing

they saw six men leave the establishment at which time they were yelling, singing, and in a loud and raucous tone of voice using profanity. They ran across the street into the parking lot, yelled something into the garage which remarks were not heard by the Police Officers, and then ran back into the Coffee Shop, brushing two young ladies who were leaving the place. When the young ladies protested they were answered profanely and the males then re-entered the establishment. One of those indulging in this conduct was Harvey Walters, a plaintiff in this case. The Police Officers entered the Coffee Shop and found it very noisy and boisterous with a lot of confusion. The Hi-fi was blasting at a very high pitch. The Police Officers walked up to Mr. Haifetz who was standing in the rear at the counter and informed him that he was under arrest. Because of the noise Mr. Haifetz was not able to hear the Officers. The Officers were able to obtain quiet from the patrons and informed Mr. Haifetz that he was under arrest charged with operating a disorderly place of business and breach of the peace, and they informed some thirty-two patrons that they were all under arrest for creating a breach of the peace. While this testimony was contradicted by Haifetz, Walters, and the other patrons, the Court does not believe them and credits the· testimony of the arresting Officers. Thirty-two patrons were transported by vans to the Nineteenth Police District at 12th and Pine Streets. Of that number, eighteen were over the age of 18 years; fourteen were under the age of 18 years, ranging in age from 14 to 17 years. Two of those arrested, boys, 18 and 19 years of age, were found hugging and squeezing each other at the time the Officers entered the place. Upon being taken to the 12th and Pine Streets Police Station those under 18 years of age were separated from those 18 years of age and above. The parents of the former were called and they were sent home in their custody. The other eighteen were booked on a charge of disorderly conduct and copies of the charge were furnished to legal and other representatives. Eventually all were released.

There is a complaint in this case that certain Constitutional rights were denied, in that there was a refusal to permit those arrested the use of the telephone and the right to consult with counsel. These charges the Court finds to be completely unfounded. From the timetables testified to at the hearings it appears to the Court that every reasonable opportunity within the limits of the facilities of the Station House were accorded the arrested patrons. All eighteen were given hearings the following morning and while these particular two plaintiffs were found guilty and fined on a charge of disorderly conduct in a summary proceeding before the Magistrate, I do not feel that this fact is of any particular importance in the decision of this case.

The role of defendant Rizzo in the raid of February 11th, 1959 was completely passive. On the night in question Captain Rizzo was off duty at home and had no knowledge of the raid and the taking of the thirty-two persons to the 12th and Pine Streets Police Station until after the fact. However, he testified that as Commanding Officer, he assumed full responsibility for the actions of his subordinates.

Captain Rizzo also testified that from time to time he received complaints from parents of persons of tender age when the parents had discovered that their children had patronized the Humoresque Coffee Shop. On many occasions the parents had requested him when possible to prevent their children from entering the Coffee Shop. Two evenings after the raid and just prior to the curfew hour for minors in Philadelphia, on the evening of February 13, 1959, Captain Rizzo was riding with Sergeant Kennedy in a patrol car through his district. As their car passed the Humoresque Coffee Shop he observed four young girls, whom he judged from appearance to be of a rather tender age, enter the establishment. Directing that the car be stopped, he entered the Coffee Shop and saw that the girls had been seated at a table and had

been joined by a youth of some 17 years of age; three of the girls were 15 years of age and one was 16 years of age. Noting at the time of his entrance that there were several people present, whom he knew to be homosexuals, he interrogated the girls as to their presence. Not being satisfied with the answers given to him he caused them to accompany him to the Nineteenth Police District where he notified their parents. Upon arrival of the parents at the Police Station the girls accompanied their parents home. No complaint on the part of the parents as to Captain Rizzo's action had been testified to in this case and apparently the parents of the youngsters were perfectly satisfied with his actions. While the Court does not condone even temporary detention of innocent persons, it does not appear from the foregoing that his action in this regard was other than in the best interests of the children themselves and that certainly there was no intent on his part to harass the individuals involved or deny them any rights granted to them by the United States Constitution or the statutes of the United States.

■ Another claim made by plaintiff Haifetz is that on more than one occasion Captain Rizzo threatened that he would keep raiding the place until he drove Haifetz out of business. Captain Rizzo denies this. However, the record clearly indicates that at the hearing before Magistrate Quinn on the 12th day of February, 1959, Rizzo asked the Magistrate at the hearing to do something so that he could close the place permanently. I am asked to find from this that Rizzo unwarrantedly attempted to drive plaintiff Haifetz out of business. I cannot so find. The very tenor of the request itself indicates that Rizzo was looking to the processes of law for guidance. I have no doubt that Rizzo did state emphatically to Haifetz and on more than one occasion that he would do everything he could to see that the breaches of peace occurring in and at the Coffee Shop would not be continued and that law and order must

prevail. It would certainly be stretching the meaning of words far beyond ordinary context to interpret what has been said above as an intention to deprive Haifetz, or any one else, of rights, privileges and immunities protected by Section 1983 of Title 42 U.S.C.A. From these words it is just as easy to assume that Captain Rizzo meant that he intended to do everything in his power within the framework of the law to see that breaches of law did not occur in his district. I have no doubt that the verbal exchanges between the two men were spirited but I can find from the entire record no unlawful intent by Captain Rizzo to deprive plaintiff Haifetz of his Constitutional or statutory rights.

■ No legal discussion of the issues involved in this case is necessary. The case turns entirely upon questions of fact. Plaintiff Haifetz ran a disorderly place of business to the extent that it became a neighborhood nuisance. What Captain Rizzo did over the period of time related showed remarkable restraint in protecting, rather than destroying, the rights of Haifetz and his patrons. Haifetz himself showed a total disregard for the rights and privileges accorded by law to his neighbors and to the public generally. Many neighbors testified as to the operation of the place and in the manner above described. Only two testified to the contrary and the Court does not believe their testimony. Under the circumstances, Haifetz has shown no wrongdoing on the part of defendant Rizzo which would entitle him to an injunction or damages. There is, therefore, no necessity to hear any testimony as to damages, no liability having been shown.

In view of what has been said above, it becomes unnecessary to re-examine the legal proposition inherent in this case, as to whether the City of Philadelphia is a 'person' within the meaning of Title 42 U.S.C.A. § 1983. The foregoing may be considered as the Court's Findings of Fact and Conclusions of Law.