

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-8-1998

# Seus v. John Nuveen & Co Inc

Precedential or Non-Precedential:

Docket 97-1498

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Seus v. John Nuveen & Co Inc" (1998). *1998 Decisions*. Paper 132.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/132

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 8, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 97-1498

SHEILA WARNOCK SEUS,
          Appellant

v.

JOHN NUVEEN & CO., INC.

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 96-cv-05971)

Argued January 20, 1998

BEFORE: BECKER,* and STAPLETON, Circuit Judges, and
FEIKENS,** District Judge

(Opinion Filed June 8, 1998)

Stephen C. Richman (Argued)
Robert P. Curley
Markowitz & Richman
1100 North American Building
121 South Broad Street
Philadelphia, PA 19107
 Attorneys for Appellant

_____

* Honorable Edward R. Becker, United States Circuit Judge for the Third
Circuit, assumed Chief Judge status on February 1, 1998.

** Honorable John Feikens, Senior United States District Judge for the
Eastern District of Michigan, sitting by designation.

Robert J. Gregory (Argued)
Equal Employment Opportunity
Commission
1801 L Street, N.W.
Washington, D.C. 20507
 Attorney for Amicus Curiae–
 Appellant

Edward C. Jepson, Jr. (Argued)
James E. Bayles, Jr.
Vedder, Price, Kaufman & Kammholz
222 North LaSalle Street, Suite 2600
Chicago, IL 60601
 and
Mitchell Feigenbaum
Mesirov, Gelman, Jaffe, Cramer &
Jamieson
1735 Market Street, 36th Floor
Philadelphia, PA 19103
 Attorneys for Appellee

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Sheila Warnock Seus sued John Nuveen & Company, Inc., her former employer, under Title VII and the ADEA. Because Seus, at the commencement of her employment, had signed a Uniform Application for Securities Industry Registration that contained arbitration and compliance clauses, the district court granted the employer's motion to compel arbitration of her claims pursuant to the Federal Arbitration Act. The court also denied Seus's motion for leave to take depositions of the National Association of Securities Dealers ("NASD"). We will affirm.

I. BACKGROUND

In 1982, Sheila Seus joined the Nuveen brokeragefirm. As a member firm of the NASD, Nuveen is required to register with the NASD all employees who deal directly with the public in the purchase and sale of over-the-counter

securities. To comply with this requirement, employees complete a Uniform Application for Securities Industry Registration, commonly referred to as a Form U-4. Approximately four months after she was hired, Seus was required to sign a Form U-4. The Form contained the following arbitration clause:

> I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm . . . that is required to be arbitrated under the rules, constitution, or by-laws of the [NASD].

App. at 5 (Form U-4, P 5). The Form also contained a "compliance clause," under which Seus agreed to:

> abide by, comply with, and adhere to all the provisions, conditions and covenants of the . . . by-laws and rules and regulations of the [NASD] as they are and may be adopted, changed or amended from time to time . . .

App. at 5 (Form U-4, P 2).

At the time Seus executed the Form U-4, the NASD Code of Arbitration Procedure required arbitration of:

> any dispute, claim or controversy arising out of or in connection with the business of any member of the [NASD], with the exception of disputes involving the insurance business of any member which is also an insurance company: (1) between or among members; (2) between or among members and public customers, or others; and (3) between or among members [and] registered clearing agencies . . . .

NASD Manual – Code of Arbitration Procedure S 1 (reprint ed. May 1982). Although the NASD Code in effect in 1982 did not explicitly state that employment disputes were subject to arbitration, the Code was amended in 1993 to do so. The current Code expressly provides for arbitration of "any dispute, claim, or controversy . . . arising out of the employment or termination of employment of associated person(s) with any member." NASD Manual– Code of Arbitration Procedure Rule 10101 (formerly S 1) (1997).

In 1996, Seus filed suit against Nuveen in the district court, alleging multiple claims of discrimination under Title

VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. SS 2000e et seq., and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C.SS 621 et seq. Based on Seus's execution of her Form U-4, Nuveenfiled a motion to dismiss and compel arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. SS 3-4. Seus, in turn, filed a motion for leave to take the deposition of the NASD pursuant to Fed. R. Civ. P. 30(b)(6) to obtain information regarding the rules, procedures, and results obtained in other employment disputes arbitrated under NASD rules.

The district court granted Nuveen's motion and dismissed Seus's complaint without prejudice, directing her to arbitrate her claims. The court concluded that the Form U-4 executed by Seus constituted a valid contractual agreement to arbitrate enforceable under the FAA, and that the arbitration agreement covered the claims asserted in this case.

The district court also denied Seus's motion to depose the NASD. It noted that the Supreme Court in Gilmer recognized the adequacy of the New York Stock Exchange's arbitration procedures, which the district court found to be "functionally equivalent" to those of the NASD. D. Ct. Op. at 15. The district court also concluded that the NASD Code of Arbitration Procedure, which details discovery procedures and subpoena powers, etc., provides information sufficient to evaluate the fairness of the arbitration process.

In accordance with our usual practice in arbitration cases, we will address, in turn, whether there is a binding agreement to arbitrate between the parties and, if so, whether this dispute is within the scope of that agreement. See PaineWebber Inc. v. Hartmann, 921 F.2d 507, 511 (3d Cir. 1990). We will then determine whether the district court abused its discretion in denying Seus's motion for discovery from the NASD. See Marroquin-Manriquez v. INS, 699 F.2d 129, 134 (3d Cir. 1983).

II. IS THERE A BINDING AGREEMENT TO
ARBITRATE?

A. The FAA

The FAA, 9 U.S.C. S 1 et seq., was enacted in 1925. Its
purpose was to make agreements to arbitrate enforceable to
the same extent as other contracts. Section 2 of the Act
provides, in relevant part:

> A written provision in . . . a contract evidencing a
> transaction involving commerce to settle by arbitration
> a controversy arising out of such contract . . . shall be
> valid, irrevocable, and enforceable, save upon such
> grounds as exist at law or in equity for revocation of
> any contract.

"Commerce," as defined in the Act, includes "commerce
among the several States." 9 U.S.C. S 1. "[C]ontracts of
employment of seamen, railroad employees, or any other
class of workers engaged in foreign or interstate commerce"
are excluded from the scope of the Act, however. Id. The
Form U-4 has been held by the Supreme Court to be a
"contract evidencing a transaction in commerce" and not to
be "a contract of employment" within the meaning of the
FAA. Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20,
25 n.2 (1991). This court and others have also held that the
"contract of employment" exception is limited to the
contracts of employees who, like seamen and railroad
workers, are engaged directly in the channels of interstate
commerce. See Great Western Mortgage Corp. v. Peacock,
110 F.3d 222, 226-27 & nn.20-21 (3d Cir. 1997) (stating
Third Circuit rule and collecting cases from other
jurisdictions).

If a party to a binding arbitration agreement is sued in a
federal court on a claim that the plaintiff has agreed to
arbitrate, it is entitled under the FAA to a stay of the court
proceeding pending arbitration, Section 3, and to an order
compelling arbitration, Section 4. If all the claims involved
in an action are arbitrable, a court may dismiss the action
instead of staying it. See Alford v. Dean Witter Reynolds,
Inc., 975 F.2d 1161, 1164 (5th Cir. 1992); Dancu v. Coopers

5

& Lybrand, 778 F. Supp. 832, 835 (E.D. Pa. 1991), aff'd, 972 F.2d 1330 (3d Cir. 1992).

Thus, the FAA on its face authorizes the enforcement action taken by the district court. It follows that we must affirm unless we conclude that legislation passed subsequent to the FAA reflects a congressional intent that agreements like the Form U-4 contract be excluded from it scope, that this Form U-4 contract is unenforceable under the provisions of the FAA, or that this dispute is not within the scope of the arbitration provision of that contract.

## B. The ADEA, OWBPA, Title VII And The Civil Rights Act of 1991:

The Implied Repealer Challenge To The Validity
Of The Agreement

Seus contends that Congress, in legislation subsequent to the FAA, has carved out an exception to its provisions for predispute agreements to arbitrate claims under the ADEA (i.e., agreements to arbitrate ADEA claims that have not arisen at the time the agreement is reached). The EEOC, which has filed an amicus brief in support of Seus's position, contends that a similar exception has been created by Congress for predispute agreements to arbitrate claims under Title VII as well. We find no such implied repealer of the FAA's provisions requiring the enforcement of agreements to arbitrate.

## 1. Gilmer and the ADEA

An argument much like that of Seus and the EEOC was made to the Supreme Court in Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20 (1991), a case that involved an ADEA claim and a Form U-4 agreement between an employee of a brokerage firm and the New York Stock Exchange. Plaintiff Gilmer was required to register with several stock exchanges, including the New York Stock Exchange ("NYSE"), as a condition of his employment. To do so, he executed a Form U-4 application containing the same language regarding arbitration as the Form U-4

6

signed by Seus except that his commitment was to arbitrate in accordance with the rules of the NYSE. The NYSE Rules in place at the time Gilmer signed his Form U-4 explicitly provided for the arbitration of any controversy between a registered representative and a NYSE member " `arising out of the employment or termination of employment of such registered representative.' " Id. (quoting NYSE Rule 347). Following Gilmer's termination at age 62, he filed an age discrimination charge with the EEOC and thereafter filed suit against his employer. In response to the employer's insistence that his claim be arbitrated, Gilmer argued that enforcement of the Form U-4 agreement to arbitrate would be inconsistent with the ADEA.

The Supreme Court began its analysis by making it clear that exceptions to the FAA's rule requiring enforcement of agreements to arbitrate are not to be recognized lightly. Because of the strong federal policy favoring arbitration, any exception must be founded on clear indicia of congressional intent:

> "[H]aving made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." In this regard, we note that the burden is on Gilmer to show that Congress intended to preclude a waiver of a judicial forum for ADEA claims. If such an intention exists, it will be discoverable in the text of the ADEA, its legislative history, or an "inherent conflict" between arbitration and the ADEA's underlying purposes. Throughout such an inquiry, it should be kept in mind that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration."

Id., at 26 (citations omitted).

Gilmer conceded that nothing in the text or legislative history of the ADEA explicitly precluded enforcement of the FAA in his situation. Rather, he argued that "compulsory arbitration of ADEA claims pursuant to arbitration agreements would be inconsistent with the statutory framework and purposes of the ADEA." Id. at 27. The Supreme Court perceived no such inconsistency.

7

The Court held that the FAA required enforcement of Gilmer's agreement to arbitrate all claims arising out of his termination of employment, including his ADEA claim. It stressed that "[b]y agreeing to arbitrate a statutory claim, a party does not forego the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial form.." Id. at 26 (quoting from Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1987)) (alteration in original). Rejecting Gilmer's argument that the arbitral process was less suited than litigation to the effective enforcement of the ADEA, the Court concluded: "[S]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." Id. at 28 (quoting from Mitsubishi, supra, at 637) (alterations in original).

The Court in Gilmer also addressed and rejected an argument that agreements to arbitrate ADEA claims should not be enforced because of the disparity in bargaining power between an employee and her employer. In the course of rejecting the argument, the Court stressed that courts should look solely to the provisions of the FAA in determining on a case-by-case basis whether an arbitration agreement is binding:

> Mere inequality in bargaining power, however, is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context. . . [T]he FAA's purpose was to place arbitration agreements on the same footing as other contracts. Thus, arbitration agreements are enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. S 2."Of course, courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds for the revocation of any contract." Mitsubishi, 473 U.S., at 627. There is no indication in this case, however, that Gilmer, an experienced businessman, was coerced or defrauded into agreeing to the arbitration clause in his registration application.

8

>           As with the claimed procedural inadequacies discussed
>           above, this claim of unequal bargaining power is best
>           left for resolution in specific cases.

Id. at 33.

Finally, the Gilmer Court rejected an argument based on
its prior decision in Alexander v. Gardner-Denver Co., 415
U.S. 36 (1974). Alexander held that an adverse decision in
an arbitration proceeding conducted pursuant to an
arbitration clause in a collective bargaining agreement
could not bar the plaintiff employee from enforcing his
rights under Title VII in a federal court. In Gilmer, the
Court acknowledged that it had expressed the view in
Alexander that "arbitration was inferior to the judicial
process for resolving statutory claims." Gilmer, 500 U.S. at
34 n.5. It hastened to add, however:

>           That "mistrust of the arbitral process," however, has
>           been undermined by our recent arbitration decisions.
>           McMahon, 482 U.S. at 231-32. "[W]e are well past the
>           time when judicial suspicion of the desirability of
>           arbitration and of the competence of arbitral tribunals
>           inhibited the development of arbitration as an
>           alternative means of dispute resolution." Mitsubishi
>           Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S.
>           614, 626-627 (1985).

Id.

Thus, the Court specifically disavowed, in the context of
Title VII claims as well as ADEA claims, the idea that the
arbitral process was inferior to the judicial process. It also
stressed that because the arbitration clause in Alexander
was contained in a collective bargaining agreement,
Alexander had not individually agreed to it, "the tension
between collective representation and individual statutory
rights" was an "important concern," and the FAA, with its
"liberal federal policy favoring arbitration," was not
applicable. Id. at 35.

2. OWBPA

Gilmer was decided on May 13, 1991. Seven months
earlier, Congress amended the ADEA by passing the Older

9

Workers Benefit Protection Act of 1990 ("OWBPA"). Gilmer apparently did not contend that these amendments were applicable to his case. Seus and the EEOC do contend that they are applicable here. Under the OWBPA, an individual "may not waive any right or claim" under the ADEA unless the waiver is knowing and voluntary. 29 U.S.C. S 626(f)(1). Moreover, a waiver cannot be considered knowing and voluntary if an individual waives "rights or claims that may arise after the date the waiver is executed." Id. at S 626(f)(1)(C). Seus and the EEOC assert that the language "any right or claim" must encompass the right to a jury trial in district court; thus, the OWBPA prohibits the enforcement of any agreement that requires an individual, in advance of an actual dispute, to forgo her statutory right to trial in a district court. They conclude that the OWBPA precludes enforcement of Seus's agreement to arbitrate. We are unpersuaded for two reasons.

First, the legislative history of the OWBPA indicates that it does "not apply with respect to waivers that occur before the date of enactment of this Act [Oct. 16, 1990]." Older Workers Benefit Protection Act, Pub. L. No. 101-433, S 202(a), 104 Stat. 978, 984 (1990) (reprinted in note to 29 U.S.C. S 626 entitled "Effective Date of 1990 Amendment" (1998)). In common parlance, a waiver "occurs" when it becomes effective, i.e., when it is executed. For that reason, we conclude that the OWBPA's waiver requirements do not apply to waivers executed before enactment of the statute. Accord Rice v. Brown Bros. Harriman & Co., No. 96 Civ. 6326(MBM), 1997 WL 129396, *5 (S.D.N.Y. Mar. 21, 1997). Because Seus executed her Form U-4 before the OWBPA was enacted, it cannot affect the arbitrability of her claim.

Second, assuming arguendo that the OWBPA did apply to Seus's case, its legislative history and the background against which it was enacted provide persuasive evidence that the protection it affords is limited to the waiver of substantive rights under the ADEA. As the Fifth Circuit explained in Williams v. Cigna Financial Advisors, Inc.,

> [i]n enacting the OWBPA, Congress' primary concern was with releases and voluntary separation agreements in which employees were forced to waive their rights. . . . [T]he OWBPA protects against the waiver of a right

10

or claim, not against the waiver of a judicial forum. The Supreme Court recognized this distinction in Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985), in which it held that

> [b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum. . . . We must assume that if Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history.
>
> We recognize that Congress, through the OWBPA, has protected terminated employees who waive their substantive rights under ADEA in exchange for a more favorable severance package; however, we find no clear indication that Congress was likewise concerned with protecting employees who agree to arbitrate claims that may arise during the course of their employment.

56 F.3d 656, 660-61 (5th Cir. 1995) (citations omitted).

The Supreme Court reads OWBPA in the same way. While OWBPA was not urged upon it as controlling authority in Gilmer, the Court did comment upon OWBPA during the course of its analysis there in a way that is highly relevant here. It observed:

> Gilmer also argues that compulsory arbitration is improper because it deprives claimants of the judicial forum provided for by the ADEA. Congress, however, did not explicitly preclude arbitration or other nonjudicial resolution of claims, even in its recent amendments to the ADEA. "[I]f Congress intended the substantive protection afforded [by the ADEA] to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history."

500 U.S. at 29 (quoting Mitsubishi Motors, 473 U.S. at 628) (emphasis added). When referring to Congress's "recent amendments to the ADEA," the Supreme Court clearly

11

meant the OWBPA. See id. at 28 n.3. While dicta, the Court's comments provide persuasive evidence contradicting the EEOC's assertion that "[b]y its plain terms, the OWBPA prohibits the enforcement of any agreement that requires an individual, in advance of an actual dispute, to forgo her statutory right of action in district court." EEOC's Br. at 14. Clearly, the Supreme Court did not interpret the OWBPA's reference to "any right or claim" as encompassing procedural rights such as the right to a judicial forum.

We thus conclude that the ADEA, as amended by the OWBPA, still reflects no Congressional intent to except from the FAA predispute agreements to arbitrate ADEA claims.

3. Title VII

Although the holding in Gilmer involved only ADEA claims and not Title VII claims, numerous courts have determined that the holding is equally applicable to Title VII proceedings. See, e.g., Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1487 (10th Cir. 1994); Bender v. A.G. Edwards & Sons, Inc., 971 F.2d 698, 700 (11th Cir. 1992); Mago v. Shearson Lehman Hutton, Inc., 956 F.2d 932, 935 (9th Cir. 1992); Willis v. Dean Witter Reynolds, Inc., 948 F.2d 305, 307 (6th Cir. 1991); Alford v. Dean Witter Reynolds, Inc., 939 F.2d 229, 230 (5th Cir. 1991). Moreover, as we have noted, the Supreme Court in Gilmer expressly disavowed its earlier expressed view that an arbitral forum was inferior to a judicial one for deciding Title VII claims. See 500 U.S. at 34 n.5.

Because Title VII and the ADEA "are similar in their aims and substantive provisions," Mago, 956 F.2d at 935, we find Title VII entirely compatible with applying the FAA to agreements to arbitrate Title VII claims.

4. Section 118 of the Civil Rights Act of 1991

On November 21, 1991, more than six months after Gilmer was decided, Congress passed the Civil Rights Act of 1991. Section 118 of that Act provides that, "Where appropriate and to the extent authorized by law, the use of

12

alternative dispute resolution, including . . . arbitration, is encouraged to resolve disputes arising under [Title VII and the ADEA]." Pub. L. 102-166, S 118 (reprinted in notes to 42 U.S.C. S 1981). On its face, the text ofS 118 evinces a clear Congressional intent to encourage arbitration of Title VII and ADEA claims, not to preclude such arbitration. The EEOC argues, nonetheless, that a Congressional intent to preclude predispute waivers of a judicial forum for Title VII claims can be discerned in the legislative history of S 118.

The EEOC points to two comments by the House Committee on Education and Labor as well as two remarks of individual legislators on the floor to support its position. In our judgment, however, no amount of commentary from individual legislators or committees would justify a court in reaching the result the EEOC would have us reach. The text adopted by the full Congress declares that lawful "arbitration . . . is encouraged to resolve disputes arising from [Title VII and the ADEA.]" That declaration simply cannot be "interpreted" to mean that the FAA is impliedly repealed with respect to agreements to arbitrate Title VII and ADEA claims that will arise in the future.1 Other courts of appeals that have addressed the issue have recognized as much. See Austin v. Owens-Brockway Glass Container, Inc., 78 F.3d 875, 881-82 (4th Cir.), cert. denied, ___ U.S. ___, 117 S. Ct. 432 (1996); Matthews v. Rollins Hudig Hall Co., 72 F.3d 50, 53 n.4 (7th Cir. 1995).

_____

1. Not surprisingly there is ample legislative history to support a straightforward reading of the text of S 118. The Report of the House Committee on the Judiciary, for example, explains S 118 as follows:

> This section "encourages" the voluntary use of conciliation, mediation, arbitration, and other methods of resolving disputes under Civil Rights laws governing employment discrimination.

> We agree that voluntary mediation and arbitration are far preferable to prolonged litigation for resolving employment discrimination claims. . . .

> We recognize that mediation and arbitration, knowingly and voluntarily undertaken, are the preferred methods of settlement of employment discrimination disputes.

H.R. Rep. No. 40(II), 102d Cong., 1st Sess. 78 (1991), reprinted in 1991 U.S.C.C.A.N. 694, 764.

13

Nor do we believe this straightforward declaration of the full Congress can be interpreted to mean that the FAA is impliedly repealed with respect to agreements to arbitrate Title VII claims which were executed by an employee as a condition of securing employment. Thus, we respectfully disagree with the decision of the Court of Appeals for the Ninth Circuit in Duffield v. Robertson Stephens & Co., No. 97-15698, 1998 WL 227469 (9th Cir. May 8, 1998). As we understand the opinion in that case, the court reads the preferatory clause, "where appropriate and to the extent authorized by law," in light of the legislative history, as a codification of a particular view of the decisional law regarding Title VII arbitration as it existed prior to the Supreme Court's decision in Gilmer. To us, it seems most reasonable to read this clause as a reference to the FAA. Moreover, we find nothing in the legislative history suggesting that this hortatory provision was intended to codify, and thus freeze, any particular view of the case law. Finally, even if we were to accept "authorized by law" as intended to codify case law, we would find the text incompatible with the notion that the law codified was case law inconsistent with a Supreme Court case decided six months before the passage of the Act.

## C. Other Challenges to the Validity of the Agreement

Seus insists that anyone seeking to enforce an agreement to arbitrate Title VII and ADEA claims must establish that the other party entered the agreement "knowingly" and "voluntarily." She insists that Nuveen has failed to carry this burden. She argues as well that her agreement is unenforceable because it was a contract of adhesion and analogous to a "yellow dog contract."

## 1. The Knowing and Voluntary Standard

As we have previously noted, contracts covered by the FAA are "valid, irrevocable, and enforceable," save upon such grounds as exist at law or in equity for revocation of any contracts. As we have also noted, Gilmer establishes that a court can decline to enforce such a contract if and only if the party resisting arbitration can point to a

14

generally applicable principle of contract law under which the agreement could be revoked.

By "knowing" and "voluntary," Seus means more than with an understanding that a binding agreement is being entered and without fraud or duress. Determining whether an agreement to arbitrate is "knowing" and "voluntary," in her view, requires an inquiry into such matters as the specificity of the language of the agreement, the plaintiff's education and experience, plaintiff's opportunity for deliberation and negotiation, and whether plaintiff was encouraged to consult counsel. She does not contend that this heightened "knowing and voluntary" standard is a generally applicable principle of contract law. Rather, Seus finds that standard in cases like Cirillo v. Arco Chemical Co., 862 F.2d 448 (3d Cir. 1988) where we found a heightened knowing and voluntary standard applicable to agreements releasing substantive claims under the ADEA.[2] Applying that standard here would be inconsistent with the FAA and Gilmer. Nothing short of a showing of fraud, duress, mistake or some other ground recognized by the law applicable to contracts generally would have excused the district court from enforcing Seus's agreement.

_____

2. Seus relies, as well, on Prudential Ins. Co. of America v. Lai, 42 F.3d 1299 (9th Cir. 1994). The court there held that a Form U-4 agreement to arbitrate under the NASD rules was unenforceable. The agreement was not "knowingly" entered insofar as employment disputes were concerned, according to the court, because the arbitration clause of the NASD rules did not specifically refer to employment disputes. We respectfully disagree with the decision of the court in Lai.

Finally, Seus, in support of her heightened "knowing and voluntary" standard, relies upon the provisions of the OWBPA and the Civil Rights Act of 1991 that we have already discussed. As we have explained, the referenced provisions of the OWBPA pertain only to the waiver or release of substantive ADEA rights claims, not procedural rights like the right to proceed in a judicial forum. With respect to the referenced legislative history of S 118, see fn. 1, p. 16, supra, we understand "knowingly and voluntarily" to invoke ordinary, well established principles of contract law rather than the heightened standard for which Seus contends.

15

2. Contract of Adhesion

Seus suggests that the arbitration agreement in the Form U-4 is invalid as a contract of adhesion because of the disparity in bargaining power between her and her employer. This very argument was rejected in Gilmer, however. Unequal bargaining power is not alone enough to make an agreement to arbitrate a contract of adhesion.

Moreover, even if we were to assume arguendo that the Form U-4 is a contract of adhesion, it would not be unenforceable. A contract of adhesion is invalid only where its terms unreasonably favor the other party. See e.g., Witmer v. Exxon Corp., 434 A.2d 1222, 1228 (Pa. 1981). In order for a contract to be invalidated as a contract of adhesion, the plaintiff "must allege both a lack of meaningful choice about whether to accept the provision in question, and that the disputed provisions were so one-sided as to be oppressive." Stebok v. American Gen. Life & Accident Ins. Co., 715 F. Supp. 711, 714 (W.D. Pa.), aff'd 888 F.2d 1382 (3d Cir. 1989). The district court found, however, that the terms of Seus's Form U-4 were neither oppressive nor unconscionable. Similarly, the district court in Beauchamp v. Great West Life Assurance Co. concluded that the Form U-4 is not oppressive or unconscionable, explaining:

> The Gilmer court has held that plaintiff is not giving up substantive statutory rights through arbitration of her Title VII claim. Thus, her agreement to arbitrate is not substantively unconscionable. Nor is the language of the U-4 form unconscionable in that it misrepresents the existence or scope of the arbitration clause. The U-4 form clearly states that the applicant should read its provisions very carefully and that any claim between plaintiff and her firm would be arbitrated if required by the arbitration code of the organization with which she registered.

918 F. Supp. 1091, 1098 (E.D. Mich. 1996) (citation omitted). We agree. The terms of the Form U-4 that Seus signed were not oppressive, unconscionable, or unreasonably favorable to either the NASD or Nuveen, the third party beneficiary of the agreement.

16

3. "Yellow Dog" Contract

Finally, Seus suggests that the arbitration agreement in the Form U-4 should be invalidated because it is analogous to the "yellow dog contracts" of the nineteenth century, in which employees agreed to waive their right to join a union in order to obtain employment. Seus asserts that the two types of contracts are analogous because in both instances employers require employees to waive their statutory rights in order to obtain employment. She argues that because Congress invalidated yellow dog contracts in the Norris-LaGuardia Act of 1932, 29 U.S.C. S 103, this court should invalidate her contract. Seus's argument fails once again because, unlike the employees who signed yellow dog contracts, Seus did not waive her substantive statutory rights by signing the Form U-4.

In short, we conclude that the Form U-4 agreement to arbitrate was valid and binding under the FAA.

III. DOES THE AGREEMENT COVER THIS DISPUTE?

A. The 1982 NASD Code of Arbitration Procedure

Seus argues that the district court improperly dismissed her action against Nuveen because employment disputes were not covered by the NASD Code of Arbitration Procedure in effect at the time she signed her Form U-4. As we have noted, section 1 of that Code provided for arbitration of:

>  any dispute . . . claim or controversy arising out of or in connection with the business of any member of the [NASD], with the exception of disputes involving the insurance business of any member which is also an insurance company: (1) between or among members; (2) between or among members and public customers, or others; and (3) between or among members [and] registered clearing agencies . . . .

Although the 1982 Code did not explicitly provide for the arbitration of employment disputes, we are persuaded that it encompassed such disputes and that Seus thus agreed to submit her Title VII and ADEA claims to arbitration.

17

As the district court pointed out, "[t]he majority of courts which have examined the pre-amendment NASD Code also have concluded that it covers employment disputes," while only the Seventh and Ninth Circuits have held otherwise. D. Ct. Op. at 10. The three different lines of reasoning that courts considering the issue have espoused were concisely explained by the Court of Appeals for the Second Circuit thus:

> In Farrand v. Lutheran Brotherhood, 993 F.2d 1253 (7th Cir. 1993), the Seventh Circuit held that S 1's three subsections ((1)-(3)) qualified the phrase "arising out of or in connection with the business of any member of the [NASD]," see id. at 1254; that an employee suing a member-employer fell into none of these subsections (most particularly that such an employee was not an "other[ ]" within the meaning of S 1(2)), see id. at 1254-55; and that employment-related disputes were therefore not arbitrable, see id. at 1255.

> In Kidd v. Equitable Life Assurance Soc'y of the United States, 32 F.3d 516 (11th Cir. 1994), the Eleventh Circuit disagreed and held that employment-related disputes are arbitrable. The Eleventh Circuit reasoned that S 1's three subsections applied, not back to that section's initial clause, but rather only to the adjoining "insurance exception" clause. See id. at 519. It therefore read S 1 to "require[ ] arbitration for any dispute connected to an NASD member's business, except for disputes involving the insurance business of an NASD member that are (1) between NASD members or (2) between NASD members and public customers or others." Id. The court thus found that an employee's claim against a member-employer is arbitrable under S 1's unqualified (as the court read it) opening clause. See id. at 519 & n. 5.

> The Tenth Circuit, in [Armijo v. Prudential Ins. Co. of Am, 72 F.3d 793 (10th Cir. 1995)], added fuel to the fire. It rejected the Eleventh Circuit's reasoning that S 1's subsections applied only to the insurance exception clause; it agreed with the Seventh Circuit that the three subsections modified the initial clause.

18

See Armijo, 72 F.3d at 798–99 n. 6. Contrary to Farrand, however, the court found that "others" in S 1(2) necessarily encompassed "associated persons" as used in S 8, and therefore included an aggrieved employee. See id. at 798–99. The court accordingly held that employment-related disputes are arbitrable, but not for the reason given by the Eleventh Circuit. See id. at 798.

Thomas James Assocs., Inc. v. Jameson, 102 F.3d 60, 64 (2d Cir. 1996). In Jameson, the Second Circuit, like the Tenth Circuit, concluded "that S 1's subsections apply to that section's opening clause, and not just to the insurance exception clause," id., and that the term"others" as used in that section includes employees having employment-related disputes with a member firm, id. at 65.

With respect to the application of S 1's subsections, we adopt the Second Circuit's line of reasoning on this issue. As the Jameson court explained:

We cannot fathom any possible reason why the NASD would except insurance business disputes from arbitration, but then only when those disputes involved certain parties. Rather, the NASD probably meant to exempt "any dispute involving the insurance business of an insurance company member from compulsory arbitration, not just those involving specific classes of individuals." To put it in the language of a grammarian, we therefore interpret the insurance exception clause as something "more akin to a parenthetical within the section rather than an independent clause modified by the language following the colon."

Id. at 64–65 (citations omitted). We agree, and likewise hold that S 1's subsections modify that section's opening clause, not the insurance exception clause.

With respect to the meaning of "others," the Armijo and Jameson courts pointed to several considerations which led them to conclude that the term encompasses employees with employment-related disputes. See Jameson, 102 F.3d at 65–66; Armijo, 72 F.3d at 798–800. First, to conclude otherwise would create a conflict between S 1 and S 8 of the

19

pre-Amendment NASD Code.3 As the Jameson court
explained:

> Unless he qualifies as an "other[ ]" under S 1(2), it is
> plain that Jameson does not fall into any category
> within S 1's subsections. And, on the other hand, S 8
> clearly contemplates that Jameson, as an "associated
> person," will arbitrate his disputes with an NASD-
> member employer. If we were to read "others" to
> exclude Jameson, S 1 would take what S 8 gives,
> rendering S 8 utterly superfluous in this respect.
> Therefore, to avoid construing one provision as
> negating the other, "we must give Section 1 an
> interpretation at least as broad as that clearly called
> for in Section 8."

102 F.3d at 65. Second, interpreting "others" to include
employees with employment-related disputes gives meaning
to the language of the Form U-4, which clearly indicates
that the applicant agrees that at least some disputes
between her and her firm would be arbitrable. See id. at 65;
Armijo, 72 F.3d at 799. Third, the NASD itself indicated as
early as 1987 that the pre-Amendment Code applied to
employment-related disputes between employees and
member firms. See Jameson, 102 F.3d at 65; Armijo, 72
F.3d at 799.

Based on these considerations, "we cannot say`with
positive assurance' that `others' does not include an
employee with an employment-related dispute against a

_____

3. Section 8 of the pre-Amendment NASD Code provided:

> Any dispute, claim or controversy eligible for submission under Part
> I of this Code between or among members and/or associated
> persons, and/or certain others, arising in connection with the
> business of such member(s), or in connection with the activities of
> such associated person(s), shall be arbitrated under this Code, at
> the instance of: (1) a member against another member; (2) a
> member against a person associated with a member or a person
> associated with a member against a member; and (3) a person
> associated with a member against a person associated with a
> member.

NASD Manual - Code of Arbitration Procedure S 1 (reprint ed. May 1982).

20

member firm." Jameson, 102 F.3d at 65. It is at least ambiguous whether that term encompasses employees with employment-related disputes. "However, to acknowledge the ambiguity is to resolve the issue, because all ambiguities must be resolved in favor of arbitrability." Armijo, 72 F.3d at 798. Accordingly, we find that the district court correctly concluded that the pre amendment NASD Code provided for arbitration of employment disputes.

B. The Compliance Clause and the Amended NASD Code

On October 1, 1993, the NASD amended its Code of Arbitration Procedure to provide for the arbitration of "any dispute, claim or controversy . . . arising out of the employment or termination of employment of associated person(s) with any member . . ." NASD Arbitration Code, Rule 10101 (formerly S 1). Nuveen argues that, regardless of whether we conclude that the pre-amendment NASD Code requires arbitration of Seus's employment dispute, we should affirm the district court's order compelling arbitration based on the compliance clause in her Form U-4 and the fact that the NASD Code explicitly provided for the arbitration of employment disputes when she commenced this action. Seus, on the other hand, argues that because the Form U-4 compliance clause did not mention the arbitration clause and was contained in a different paragraph, the compliance clause is reasonably read only to require Seus to conform her behavior, as a securities dealer, to subsequent changes in the NASD rules. 4

Seus's argument contradicts the holding of the vast majority of courts to consider this issue. Most courts have found that the Form U-4 compliance clause obligates a registrant to comply with the NASD Arbitration Code as it existed at the time she filed suit. See, e.g., Cremin v. Merrill Lynch Pierce Fenner & Smith, Inc., 957 F. Supp. 1460, 1475-77 (N.D. Ill. 1997); Schuetz v. CS First Boston Corp.,

_____

4. As noted above, the Form U-4 compliance clause bound Seus to "abide by, comply with, and adhere to all the provisions, conditions and covenants of the . . . by-laws and rules and regulations as they may be adopted, changed or amended from time to time . . . ." App. at 5 (Form U-4, P 2).

No. 96 Civ. 5557, 1997 WL 452392, *4 (S.D.N.Y. Aug. 8, 1997); Stone v. Pennsylvania Merchant Group, Ltd., 949 F. Supp. 316, 323-24 (E.D. Pa. 1996). We agree. Seus clearly bound herself to comply with amendments to the NASD's rules, including those governing arbitration.

## IV. SEUS'S MOTION TO DEPOSE THE NASD

Seus claims that current NASD arbitration procedures are inadequate to protect her statutory and due process rights. As evidence of this, she points to the NASD's recent decision to abandon its policy of requiring agreements to arbitrate employment discrimination claims as a condition of employment with a member.[5] Seus insists that the

_____

5. On December 17, 1997, after the district court decision in this case, the NASD submitted to the SEC the following proposed change to Rule 10201 (Required Submission) (formerly S 8) of the Code of Arbitration Procedure:

> (b) A claim alleging employment discrimination or sexual harassment in violation of a statute is not required to be arbitrated.
> Such a claim may be arbitrated only if the parties have agreed to arbitrate it, either before or after the dispute arose.

62 Fed. Reg. 66164, 66164 (Dec. 17, 1997). Seus views this proposed rule change as an explicit admission by NASD that absent employee free choice, neither it, nor the court, should rely on the Form U-4 to compel arbitration of all employment claims. Since the NASD has decided to give its registrants a choice between signing an agreement to arbitrate and reserving the right to file an employment-related claim in federal court, Seus argues, this court should allow Seus the same choice.

The NASD's abandonment of its policy of requiring employees to sign agreements to arbitrate as a condition of registration is irrelevant in this case. The rule change is only a proposal. The SEC has not yet approved it, nor is it obligated to do so. The proposed rule change has no legal force at this time. Moreover, even if the SEC approves the rule change, the NASD has requested that it not take effect until one year after such approval. 62 Fed. Reg. at 66167. Presumably, then, the rule change would not become effective until well after the completion of Seus's arbitration. In any event, the proposed amendment does not reflect a determination that the arbitral process is not fair and effective. It reflects only a policy decision that a commitment to arbitrate employment discrimination claims should not be required as a condition of employment. The amendment expressly recognizes that voluntary agreements to arbitrate will continue to be enforceable whether entered before or after the alleged violation occurs.

district court should have allowed her to conduct further discovery on this issue before reaching its decision to compel arbitration.

We review the district court's denial of Seus's motion for an abuse of discretion. We find none.

Congress has decreed that arbitration is a favored means of dispute resolution. While this does not mean that arbitration pursuant to any kind of arbitral process is consistent with federal policy, the detailed provisions of the NASD Code of Arbitration Procedure are sufficient to permit the kind of evaluation conducted in Gilmer and, as the district court observed, the process required by that Code is the functional equivalent of the process found in Gilmer to be consistent with the effective enforcement of the ADEA.6 Moreover, if there be any inadequacies or unfairness in the application of those rules in this specific case, judicial review will be available. 9 U.S.C. S 10; Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465, 1486–87 (D.C. Cir. 1997). Under these circumstances, declining to permit a deposition of the NASD prior to ordering submission of the dispute to arbitration was well within the discretion of the district court.

V. CONCLUSION

The order of the district court dismissing Seus's claims without prejudice and directing arbitration will be affirmed.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit
_____

6. In addition to information about the process readily available from the Code, Seus sought to inquire into the race, sex, age and professional backgrounds of the arbitrators, procedures for selecting arbitrators, the cost of arbitration, the percentage of arbitration cases involving age and sex employment discrimination claims, the specific results of the arbitration decisions in employment discrimination cases, the location and scheduling of hearings, and the timeliness of decisions.

23