345 F.3d 742
 Equal Employment Opportunity Commission, Plaintiff-Appellee,
v.
Luce, Forward, Hamilton & Scripps, Defendant-Appellant.
Equal Employment Opportunity Commission, Plaintiff-Appellant,
v.
Luce, Forward, Hamilton & Scripps, Defendant-Appellee.
 No. 00-57222.
 No. 01-55321.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 27, 2003 — San Francisco, California.
 Filed September 30, 2003.
 
 Charles A. Bird, Kelly Capen Douglas, Luce, Forward, Hamilton & Scripps LLP, San Diego, California, for the defendant-appellant-appellee.
 Dori Bernstein, EEOC, Washington, DC, for the plaintiff-appellee-appellant.
 Cliff Palefsky, McGuinn, Hillsman & Palefsky, San Francisco, California, for intervenor Donald Lagatree, and for amici curiae National Employment Lawyers Association and American Association of Retired Persons.
 Robert F. Walker, Paul Hastings Janofsky & Walker LLP, Los Angeles, California, for amicus curiae The Employers Group.
 David S. Schwartz, University of Wisconsin Law School, Madison, Wisconsin, and John M. True, Leonard Carder, LLP, Oakland, California, for amici curiae George Miller, Barney Frank, Dennis J. Kucinich, John Conyers, Jr., Robert E. Andrews, William D. Delahunt, Harold E. Ford, Jr., Ron Kind, Edward J. Markey, Major R. Owens, Donald M. Payne, Hilda L. Solis, John F. Tierney, and Lynn L. Woolsey, Members of the United States House of Representatives.
 Ann Elizabeth Reesman, McGuiness Norris & Williams, LLP, Washington, DC, for amici curiae Equal Employment Advisory Council and LPA, Inc.
 Appeals from the United States District Court for the Central District of California; Florence Marie Cooper, District Judge, Presiding. D.C. No. CV 00-01322 FMC.
 Before: Mary M. Schroeder, Chief Judge, Harry Pregerson, Stephen Reinhardt, Pamela Ann Rymer, A. Wallace Tashima, Barry G. Silverman, Susan P. Graber, M. Margaret McKeown, William A. Fletcher, Richard C. Tallman, and Richard R. Clifton, Circuit Judges.
 Opinion by Judge Tashima; Partial Concurrence and Partial Dissent by Judge Pregerson; Dissent by Judge Reinhardt.
 OPINION
 TASHIMA, Circuit Judge.
 
 
 1
 Donald Scott Lagatree was refused employment as a legal secretary by Luce, Forward, Hamilton & Scripps LLP ("Luce Forward") because he refused to sign an agreement to arbitrate all claims arising from his employment. Lagatree unsuccessfully sued Luce Forward in California state court. On Lagatree's behalf, however, the Equal Employment Opportunity Commission ("EEOC") brought this action against Luce Forward for retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-3, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12203(a), the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623(d), and the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 215(a). The EEOC sought make-whole relief, lost wages and benefits, as well as emotional distress and punitive damages for Lagatree. The EEOC also sought a permanent injunction forbidding Luce Forward from (1) requiring that employees sign arbitration agreements as a condition of employment, and (2) engaging in unlawful retaliation.
 
 
 2
 The district court refused, on res judicata grounds, to award make-whole relief and rejected the EEOC's request for injunctive relief under the ADA, the ADEA, and the EPA. Relying on our decision in Duffield v. Robertson Stephens & Co., 144 F.3d 1182 (9th Cir.1998), however, the district court enjoined Luce Forward from requiring applicants to agree to arbitrate Title VII claims and from enforcing existing agreements to arbitrate those claims. EEOC v. Luce, Forward, Hamilton & Scripps, LLP, 122 F.Supp.2d 1080 (C.D.Cal.2000) ("Luce Forward I"). Luce Forward appealed and the EEOC cross-appealed.
 
 
 3
 A three-judge panel reversed the district court's grant of injunctive relief, holding that "employers may require employees to sign agreements to arbitrate Title VII claims as a condition of their employment." EEOC v. Luce, Forward, Hamilton, & Scripps, 303 F.3d 994, 997 (9th Cir.2002) ("Luce Forward II"). The panel concluded that the Supreme Court's decision in Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001), implicitly overruled our decision in Duffield. Luce Forward II, 303 F.3d at 997. Concluding that Lagatree had not engaged in protected activity in refusing to sign the agreement, the panel also rejected the EEOC's argument that Luce Forward's refusal to hire Lagatree because of his refusal to sign the agreement constituted illegal retaliation. Id.
 
 
 4
 Because of the importance of the issue, we agreed to rehear this case en banc. EEOC v. Luce, Forward & Hamilton, & Scripps, 319 F.3d 1091 (9th Cir. 2003). While we disagree with Luce Forward II's conclusion that Circuit City implicitly overruled Duffield, we need not explore that disagreement in detail.[1] It suffices to note that the panel opinion has been withdrawn. Id. We now conclude that, although Circuit City did not overrule Duffield, Duffield was wrongly decided; we therefore overrule it ourselves.
 
 FACTUAL BACKGROUND
 
 5
 Lagatree was presented with Luce Forward's standard offer letter on his first day of work. The offer letter included an arbitration provision requiring Lagatree to submit all "claims arising from or related to [his] employment" to binding arbitration. It provided:
 
 
 6
 In the event of any dispute or claim between you and the firm (including employees, partners, agents, successors and assigns), including but not limited to claims arising from or related to your employment or the termination of your employment, we jointly agree to submit all such disputes or claims to confidential binding arbitration, under the Federal Arbitration Act. Any arbitration must be initiated within 180 days after the dispute or claim first arose, and will be heard before a retired State or Federal judge in the county containing the firm office in which you were last employed. The law of the State in which you last worked will apply.
 
 
 7
 Lagatree objected to the arbitration provision, explaining that he "couldn't sign... the arbitration agreement" because "it was unfair." In his deposition, Lagatree testified that he believed he needed to retain his "civil liberties, including the right to a jury trial and redress of grievances through the government process."
 
 
 8
 Luce Forward told Lagatree that the arbitration agreement was a non-negotiable condition of employment. When Lagatree still refused to sign the agreement, Luce Forward withdrew its job offer. It is undisputed that Luce Forward refused to hire Lagatree only because he would not sign the arbitration provision.[2]
 
 
 9
 Lagatree sued Luce Forward in state court, alleging wrongful termination in violation of public policy and in violation of the California Unfair Competition Law. Cal. Bus. & Prof.Code §§ 17200-17209; Cal. Civ.Code § 1668. Lagatree sought lost wages, damages for emotional distress, and punitive damages. The state court sustained Luce Forward's demurrer to the complaint, holding that Luce Forward did not unlawfully discharge Lagatree when he refused to sign a predispute arbitration agreement as a condition of employment. The California Court of Appeal affirmed, and the California Supreme Court denied review. Lagatree v. Luce, Forward, Hamilton & Scripps LLP, 74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664 (1999), review denied, 2000 Cal. LEXIS 262, at *1 (Cal.2000).
 
 
 10
 While his state court suit was pending, Lagatree filed a discrimination charge with the EEOC, alleging that he was wrongfully terminated in retaliation for refusing to sign the Luce Forward arbitration provision. The EEOC sued Luce Forward on behalf of Lagatree and in the public interest, arguing that (1) Duffield prohibited Luce Forward from requiring Lagatree to sign an arbitration agreement, and (2) by refusing to hire Lagatree, Luce Forward unlawfully retaliated against him for asserting his constitutional right to a jury trial. The EEOC sought make-whole relief for Lagatree, including "rightful place employment," back wages and benefits, and compensatory and punitive damages. The EEOC also sought a permanent injunction enjoining Luce Forward from engaging in unlawful retaliation and ordering Luce Forward to "desist from utilizing mandatory arbitration agreements."
 
 
 11
 The district court denied monetary relief on res judicata grounds, finding that the state court judgment precluded the EEOC from obtaining monetary relief on Lagatree's behalf. Luce Forward I, 122 F.Supp.2d at 1086. The district court further ruled, however, that "[a]lthough the EEOC is in privity with Lagatree with respect to the claims for individual relief..., the same is not true for the EEOC's claims for injunctive relief pursuant to its duty to vindicate the public's interest in preventing employment discrimination." Id. at 1088. Observing that "Duffield is the law of the Ninth Circuit," the district court permanently enjoined Luce Forward from:
 
 
 12
 1) requiring or requesting its employees to agree to arbitration of their Title VII claims as a condition of employment; and
 
 
 13
 2) attempting to enforce any such previously executed agreements to arbitrate Title VII claims.[3]
 
 
 14
 Id. at 1093.
 
 
 15
 The district court did not expressly rule on the EEOC's retaliation theory, apparently considering it to be a subset of the question of monetary relief.
 
 
 16
 Luce Forward timely appealed the district court's injunction. The EEOC cross-appealed, seeking to enjoin Luce Forward from engaging in an "unlawful retaliatory practice by denying employment to any applicant... who refuses to waive his right to participate in statutorily protected... proceedings."[4]
 
 STANDARD OF REVIEW
 
 17
 We review a grant of summary judgment de novo. See Clicks Billiards Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1257 (9th Cir.2001). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. See Delta Sav. Bank v. United States, 265 F.3d 1017, 1021 (9th Cir.2001), cert. denied, 534 U.S. 1082, 122 S.Ct. 816, 151 L.Ed.2d 700 (2002). "Here, the facts underlying the district court's conclusion ... are not in dispute; therefore, the only question we must determine is whether the district court correctly applied the law." Tri-State Dev., Ltd. v. Johnston, 160 F.3d 528, 529 (9th Cir.1998).
 
 DISCUSSION
 
 18
 A. Duffield Erred in Concluding that the Civil Rights Act of 1991 Precludes Mandatory Arbitration of Title VII Claims
 
 1. The Civil Rights Act of 1991
 
 19
 Federal law prohibits an employer from discriminating against an employee or applicant for employment "because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1) (Title VII), "disability," 42 U.S.C. § 12112(a) (ADA), or "age," 29 U.S.C. § 623(a)(1) (ADEA). The EPA makes it unlawful to pay lower wages on the basis of an employee's sex. 29 U.S.C. § 206(d)(1). The Civil Rights Act of 1991 (the "1991 Act") was enacted to restore civil rights limited by then-recent Supreme Court decisions and to "strengthen existing protections and remedies available under federal civil rights laws to provide more effective deterrence and adequate compensation for victims of discrimination." H.R.Rep. No. 102-40(II), at 1 (1991), reprinted in 1991 U.S.S.C.A.N. 549; see also Desert Palace, Inc. v. Costa, ___ U.S. ___, ___, 123 S.Ct. 2148, 2151, 156 L.Ed.2d 84 (2003) ("Congress passed the 1991 Act `in large part [as] a response to a series of decisions of this Court interpreting the Civil Rights Acts of 1866 and 1964.'") (quoting Landgraf v. USI Film Prods., 511 U.S. 244, 250, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (brackets in the original)). The 1991 Act provided for the first time a right to damages and to trial by jury, and expanded Title VII's fee-shifting provisions. See H.R.Rep. No. 40(I) at 30; H.R. Rep. No. 40(II) at 1-4 (1991), reprinted in 1991 U.S.C.C.A.N. 694, 694-96. The 1991 Act also included a "polite bow to the popularity of `alternative dispute resolution.'" Pryner v. Tractor Supply Co., 109 F.3d 354, 363 (7th Cir. 1997) (internal quotation marks omitted). Specifically, § 118 of the 1991 Act provided that "[w]here appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including... arbitration, is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this title." Pub.L. No. 102-166, § 118, 105 Stat. 1071 (codified at Notes to 42 U.S.C. § 1981).
 
 
 20
 Six months before the November 1991 enactment of the 1991 Act, the Supreme Court decided Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). In that case, decided on May 13, 1991, the Court held that a claim under the ADEA could be subjected to compulsory arbitration pursuant to an arbitration provision in a securities registration application requiring arbitration of "[a]ny controversy between a registered representative and any member or member organization arising out of the employment or termination of employment of such registered representative." Id. at 23, 111 S.Ct. 1647. The Court noted that statutory claims established by several different congressional acts may be the subject of arbitration agreements, enforceable under the FAA. Id. at 26, 111 S.Ct. 1647 (listing various acts). The Court also reiterated its position that "`[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.'" Id. (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)).
 
 
 21
 The Court stated that statutory claims can be made subject to arbitration, "`unless Congress itself has evinced an intention to preclude a waiver of judicial remedies.'" Id. (quoting Mitsubishi Motors, 473 U.S. at 628, 105 S.Ct. 3346). The Court placed the burden on Gilmer to demonstrate that Congress intended to preclude a waiver of a judicial forum as "discoverable in the text of the ADEA, its legislative history, or an `inherent conflict' between arbitration and the ADEA's underlying purposes." Id. The Court also explained that such an inquiry must by guided by a "`healthy regard for the federal policy favoring arbitration.'" Id. (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)).
 
 
 22
 Gilmer is clearly a shift from the Court's earlier position in Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), which held that a unionized employee's earlier exercise of the compulsory arbitration provision in a collective bargaining agreement did not preclude him from later pursuing a Title VII discrimination claim in a judicial forum. Id. at 49, 94 S.Ct. 1011. Alexander also contained dicta suggesting that the judicial forum could not be waived for Title VII claims. See id. at 45, 94 S.Ct. 1011 ("[F]ederal courts have been assigned plenary powers to secure compliance with Title VII."), id. at 52, 94 S.Ct. 1011 ("[A]n employee's rights under Title VII may not be waived prospectively."). Many courts interpreted Alexander as precluding mandatory arbitration of Title VII claims. See, e.g., Utley v. Goldman Sachs & Co., 883 F.2d 184, 187 (1st Cir.1989) ("As Congress has made the policy against discrimination `a highest priority,' Alexander, 415 U.S. at 47, 94 S.Ct. 1011, we rule that an employee cannot waive prospectively her right to a judicial forum at any time, regardless of the type of employment agreement which she signs."); Swenson v. Mgmt. Recruiters Int'l, Inc., 858 F.2d 1304, 1306-07 (8th Cir.1988) ("The analysis of Alexander lends strong support that Congress did not intend federal judicial proceedings in discrimination cases to be preempted by employment arbitration agreements enforceable under the FAA. The Court pointed up an inherent conflict between arbitration and the underlying purposes of Title VII which evince a congressional intent to prohibit waiver of judicial forums.... We conclude that in the passage of Title VII it was the congressional intent that arbitration is unable to pay sufficient attention to the transcendent public interest in the enforcement of Title VII."); Rosenfeld v. Dep't of the Army, 769 F.2d 237, 239 (4th Cir.1985) (stating that the "plain lesson" of Alexander is that Congress entrusted the final resolution of Title VII claims to the federal courts).
 
 
 23
 In Gilmer, the Court did not explicitly overrule Alexander, but limited its holding to the collective bargaining context. 500 U.S. at 35, 111 S.Ct. 1647. We have previously stated that "[a]lthough `the Supreme Court [did] not overrule Alexander in Gilmer, it [did] reject a reading of Alexander as prohibiting the arbitration of employment discrimination claims.'" Nghiem v. NEC Elec., Inc., 25 F.3d 1437, 1441 (9th Cir.1994) (quoting Willis v. Dean Witter Reynolds, Inc., 948 F.2d 305, 308 (6th Cir. 1991)).
 
 
 24
 In the post-Gilmer world, our decision in Duffield stands alone. All of the other circuits have concluded that Title VII does not bar compulsory arbitration agreements. See Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, 170 F.3d 1, 21 (1st Cir.1999) (holding that "there was no congressional intent to preclude pre-dispute arbitration agreements manifested in the [1991 Act]" but finding enforcement of the agreement inappropriate on facts of the case); Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc., 191 F.3d 198, 206 (2d Cir. 1999) (holding that the plaintiff did not meet his burden of establishing that Congress intended to preclude waiver of judicial remedies for Title VII claims); Seus v. John Nuveen & Co., 146 F.3d 175, 182 (3d Cir.1998) (finding "Title VII entirely compatible with applying the FAA to agreements to arbitrate Title VII claims"), abrogated on other grounds by Blair v. Scott Specialty Gases, 283 F.3d 595, 599-602 (3d Cir.2002); Alford v. Dean Witter Reynolds, Inc., 939 F.2d 229, 230 (5th Cir.1991) (holding that Title VII claims can be subject to compulsory arbitration); Koveleskie v. SBC Capital Mkts., Inc., 167 F.3d 361, 365 (7th Cir.1999) (holding that "Congress did not intend Title VII to preclude enforcement of pre-dispute arbitration agreements"); Patterson v. Tenet Healthcare, Inc., 113 F.3d 832, 837 (8th Cir.1997) (holding that Title VII claims are subject to pre-dispute arbitration agreements under the FAA); Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1487 (10th Cir.1994) (holding that Title VII claims are subject to mandatory arbitration); Bender v. A.G. Edwards & Sons, Inc., 971 F.2d 698, 699 (11th Cir.1992) (per curiam) (holding that Title VII claims are subject to securities industry compulsory arbitration); cf. Austin v. Owens-Brockway Glass Container, Inc., 78 F.3d 875, 881-82 (4th Cir.1996) (Title VII no bar to collective bargaining agreement to first pursue arbitration); Willis, 948 F.2d at 307 (holding that, under Gilmer, an arbitration agreement in securities registration is enforceable with respect to Title VII claims, but noting that it is not an employment contract).
 
 2. Our Decision in Duffield
 
 25
 In Duffield, we held that for Title VII claims, the 1991 Act precludes enforcement of arbitration agreements entered into as a condition of employment. 144 F.3d at 1185. We considered the 1991 Act's text, legislative history, and general purpose to discern whether Congress had evinced an intent to preclude waiver of judicial remedies for the statutory right at issue. Id. at 1190-1200. We based our holding that the 1991 Act precludes "compulsory arbitration"[5] of Title VII actions on three bases: (1) We read the purpose of the 1991 Act to be at odds with compulsory arbitration agreements. (2) We read the text of § 118 to limit arbitration agreements to those entered into voluntarily. (3) We read the legislative history of § 118 to evince a congressional intent to so limit its application. On reconsideration en banc, we now conclude that our holding in Duffield was in error.
 
 
 26
 a. Purpose of the 1991 Act
 
 
 27
 In Duffield, we found the purpose of the 1991 Act to be at odds with compulsory arbitration agreements. We noted that the "purpose of the [1991] Act was uniformly to expand employees' rights and `to increase the possible remedies available to civil rights plaintiffs.'" 144 F.3d at 1192, (quoting Prudential Ins. Co. of Am. v. Lai, 42 F.3d 1299, 1304 (9th Cir.1994)[6] (emphasis added in Duffield)). We concluded that the most plausible reading of the statutory provision encouraging arbitration directed it towards voluntary agreements:
 
 
 28
 It thus would be "at least a mild paradox" to conclude that in the very Act of which the "primary purpose" was "to strengthen existing protections and remedies available [to employees under Title VII]," Congress "encouraged" the use of a process whereby employers condition employment on their prospective employees' surrendering their rights to a judicial forum for the resolution of all future claims of race or sex discrimination and force those employees to submit all such claims to compulsory arbitration. It seems far more plausible that Congress meant to encourage voluntary agreements to arbitrate....
 
 
 29
 Id. at 1192-93 (citations and footnote omitted) (brackets and emphasis in the original).
 
 
 30
 The presumption in Duffield, however, that allowing compulsory arbitration weakens the 1991 Act is inconsistent with the Supreme Court's endorsement of arbitration. See Gilmer, 500 U.S. at 30, 111 S.Ct. 1647 ("Such generalized attacks on arbitration `rest[] on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants,' and as such, they are `far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes.'" (quoting Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 481, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989))). In addition, the view that compulsory arbitration weakens Title VII conflicts with the Supreme Court's stated position that arbitration affects only the choice of forum, not substantive rights. See EEOC v. Waffle House, Inc., 534 U.S. 279, 296 n. 10, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002); Gilmer, 500 U.S. at 26, 111 S.Ct. 1647. Moreover, the EEOC, which "was intended `to bear the primary burden of litigation,'" Waffle House, 534 U.S. at 286, 122 S.Ct. 754 (quoting Gen. Tel. Co. of N.W., Inc. v. EEOC, 446 U.S. 318, 326, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980)), retains this role. Despite the presence of an employee-employer arbitration agreement, the EEOC can still pursue judicial remedies because it is not a party to such agreements. Waffle House, 534 U.S. at 294, 122 S.Ct. 754 ("It goes without saying that a contract cannot bind a nonparty. Accordingly, the proarbitration policy goals of the FAA do not require the agency to relinquish its statutory authority if it has not agreed to do so.").
 
 
 31
 We also reject the argument of certain amici that the 1991 Act's provision of a right to jury trial precludes arbitration of Title VII claims. As Duffield acknowledged, that right provides no general bar to voluntary arbitration. 144 F.3d at 1189 ("We [previously] rejected the argument that simply because the 1991 Act's amendments to Title VII provide for the right to jury trial, that right evinces a congressional intent to allow claimants to escape the binding effect of arbitrations that they initiated." (citing Nghiem, 25 F.3d at 1441)). Although Duffield distinguished compulsory from voluntary arbitration, see id., we now join several other circuits in concluding, pursuant to Gilmer, that the right to jury trial presents no bar to compulsory arbitration. See Desiderio, 191 F.3d at 205 ("[I]t is untenable to contend that compulsory arbitration conflicts with the Act's provision for the right to a jury trial, because Gilmer ruled that compulsory arbitration clauses could be enforced in claims under the ADEA, a statute that explicitly provides for jury trials."); Rosenberg, 170 F.3d at 11 ("The district court's comment that an endorsement of arbitration would be at odds with the 1991 [Act's] creation of a right to a jury trial ... ignores Gilmer's endorsement of arbitration under the ADEA—which also provides for jury trials. It may also evince a distrust of arbitration that the Supreme Court has long since disavowed. While people may and do reasonably disagree about whether pre-dispute arbitration agreements are a wise way of resolving discrimination claims, there is no `inherent conflict' between the goals of Title VII and the goals of the FAA, as Gilmer used that phrase.").
 
 
 32
 We thus disagree with Duffield's conclusion that a conflict exists between the purpose of Title VII and compulsory arbitration of Title VII claims.[7]
 
 
 33
 b. Text of Section 118
 
 
 34
 As noted, § 118 provides: "Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including . . . arbitration, is encouraged to resolve disputes arising under the [1991] Acts or provisions of Federal law amended by this title." Nothing in the text directly demonstrates a congressional intent to preclude compulsory arbitration agreements. Nonetheless, in Duffield, we concluded that the "text of the section is, at a minimum, ambiguous — and that, at a maximum, it stands for a proposition" that compulsory arbitration is precluded. 144 F.3d at 1193 (emphasis in the original). We concluded that the terms "where appropriate" and "to the extent authorized by law," in § 118, limited congressional encouragement of arbitration to situations where it would be "both legally permissible and appropriate." Id. at 1193 (emphasis in the original). We then read the term "where appropriate" to limit arbitration to situations furthering the objectives of the 1991 Act, which we construed to be limited to providing an opportunity for discrimination victims to employ an alternative forum if they desired. Id. at 1194. We found this purpose to be at odds with compulsory arbitration because it conflicted with Title VII's purpose to expand employee rights. Id. This reading merely repeats the faulty presumption that arbitration undermines the 1991 Act's purpose. The phrase "where appropriate" simply provides no direct indication that Congress intended to preclude a waiver of the judicial forum.
 
 
 35
 We interpreted "to the extent authorized by law" to refer to Congress' understanding of the law at the time. The Duffield court concluded that Congress understood the law as articulated by Alexander and cases following it, rather than Gilmer. Duffield's rationale for this interpretation was that "as of the time § 118 was drafted and reported out of the House Education and Labor Committee, the circuit courts, without exception, had `widely interpreted' Title VII as prohibiting `any form of compulsory arbitration.'" Id. at 1194 (quoting Lai, 42 F.3d at 1303) (emphasis added by Duffield). Duffield acknowledged that, prior to the enactment of the 1991 Act, the decision in Gilmer made the law less clear, but suggested that "it was still at least an open question whether Gilmer applied to Title VII claims." Id.
 
 
 36
 This analysis is problematic in several respects. First, the ADEA, at issue in Gilmer, contains a section identical to § 118. See 42 U.S.C. § 12212 ("Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including . . . arbitration is encouraged to resolve disputes arising under this chapter."). Although the Gilmer Court did not expressly interpret the ADEA's text because Gilmer conceded that nothing in the text precluded arbitration, 500 U.S. at 26, 111 S.Ct. 1647, it squarely held that claims under the ADEA can be subjected to compulsory arbitration. Id. at 23, 111 S.Ct. 1647. In addition, although the Court decided Gilmer close in time to the passage of the 1991 Act, we must "assume that Congress is aware of existing law when it passes legislation." Miles v. Apex Marine Corp., 498 U.S. 19, 32, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990). Gilmer was decided in May 1991 and the 1991 Act was not enacted until November of that year. During this intervening six months, Congress surely became aware that Gilmer, and not Alexander, provided the Supreme Court's prevailing assessment of employment arbitration agreements. Moreover, the legal landscape encompassed by the phrase, "to the extent authorized by law," must also include the FAA. See, e.g., Seus, 146 F.3d at 183 ("[I]t seems most reasonable to read this clause as a reference to the FAA."). This aspect of the law also incorporated the "liberal federal policy favoring arbitration agreements." Moses H. Cone Mem'l Hosp., 460 U.S. at 24, 103 S.Ct. 927.
 
 
 37
 Finally, as other courts have pointed out, it would be ironic to interpret statutory language encouraging the use of arbitration and containing no prohibitory language as evincing Congress' intent to preclude arbitration of Title VII claims. See, e.g., Armendariz v. Found. Health Psychcare Serv., Inc., 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669, 677 (2000) ("[I]t is difficult to believe that Congress would have chosen to ban mandatory employment arbitration by means of a clause that encourages the use of arbitration and has no explicit prohibitory language, when it could have simply and straightforwardly proscribed mandatory employment arbitration of Title VII claims."); Seus, 146 F.3d at 183 ("Nor do we believe this straightforward declaration of the full Congress can be interpreted to mean that the FAA is impliedly repealed with respect to agreements to arbitrate Title VII claims which were executed by an employee as a condition of securing employment.").
 
 
 38
 We therefore conclude that the text of § 118 does not present any ambiguity suggesting that it may be intended to preclude compulsory arbitration.
 
 
 39
 c. Legislative History
 
 
 40
 In Duffield, we also concluded that Congress had precluded applicability of arbitration agreements to Title VII claims because of the legislative history of the 1991 Act. We stated that it was the "unusual force and clarity of the statute's legislative history that is ultimately dispositive in this case." 144 F.3d at 1195. The legislative history does contain language suggesting that Congress intended to retain the judicial forum.[8] We conclude, however, that this history should not be relied on to establish that Congress intended to preclude waiver of a judicial forum in derogation of a clear and unambiguous statute.
 
 
 41
 Because the text of § 118 is unambiguous, we are precluded from considering legislative history. See Desert Palace, ___ U.S. at ___, 123 S.Ct. at 2153 ("And where, as here, the words of the statute are unambiguous, the judicial inquiry is complete." (citations and internal quotation marks omitted)); Circuit City, 532 U.S. at 119, 121 S.Ct. 1302; Robinson v. Shell Oil Co., 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) ("Our inquiry must cease if the statutory language is unambiguous and `the statutory scheme is coherent and consistent.'") (quoting United States v. Ron Pair Enter., Inc., 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)); Ratzlaf v. United States, 510 U.S. 135, 147-48, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear.").
 
 
 42
 As the Second Circuit aptly explained in Desiderio:
 
 
 43
 While the language cited from the Committee reports suggests the preservation of the right to a judicial remedy under Title VII, such language is not found in the text of the statute. Rather, the Act says that the use of arbitration is to be "encouraged." We recognize that Congress' aim to foster arbitration, by itself, does not thereby require us to preserve an agreement waiving rights to a judicial forum. But, we assume, as does the Supreme Court, that the drafters of Title VII and the amendments introduced in the [1991] Act were well aware of what language was required for Congress to evince an intent to preclude a waiver of judicial remedies. In construing Title VII, the absence of that language is a meaningful omission. Moreover, the substantive rights found in the statute are not in any way diminished by our holding that arbitration may be compelled in this case, since only the forum — an arbitral rather than a judicial one — is affected, and plaintiff's rights may be as fully vindicated in the former as in the latter. As a result, and primarily because we find the language of the statute to be clear, we need not consider the inconsistent legislative history.
 
 
 44
 191 F.3d at 205-06 (citation omitted).
 
 
 45
 If Congress intended to preclude Gilmer from permitting enforcement of arbitration agreements, it knew how to do so. In fact, other provisions of the 1991 Act are devoted to overruling Supreme Court decisions. See H.R.Rep. No. 102-40(II), at 2 (1991), reprinted in 1991 U.S.S.C.A.N. 549 (discussing the Supreme Court cases that the 1991 Act overrules).[9]
 
 B. Retaliation Claim
 
 46
 In its cross-appeal, the EEOC appeals the district court's denial of a permanent injunction to "enjoin [Luce Forward] from engaging in an unlawful retaliatory practice by denying employment to any applicant or employee who refuses to waive his or her right to participate in statutorily protected enforcement proceedings under all the federal anti-discrimination laws: Title VII, the ADA, the ADEA, and the EPA." Except for applying Duffield to the Title VII claim, the district court did not address the issues raised by the EEOC's request for injunctive relief on these claims.
 
 
 47
 At least on the surface, it would appear that, if an employer can compel its employees to submit all claims arising out of their employment to arbitration, no retaliation would be involved in an employer's exercise of such right, because an employee opposing such a practice would not be engaged in any protected activity. At oral argument, however, the EEOC advanced a novel theory why, even assuming our overruling of Duffield, an employer's adverse action against an employment applicant for his or her opposition to compulsory arbitration would still amount to retaliation under the Civil Rights Acts. Because this argument was not fully developed on appeal, we leave it to the district court to address on remand.
 
 CONCLUSION
 
 48
 For all of the foregoing reasons, we overrule our decision in Duffield. Because it was based on Duffield, we reverse the judgment of the district court insofar as it granted the EEOC's request for injunctive relief. With regard to the EEOC's request for injunctive relief on its retaliation theory, we remand this issue to the district court to address in the first instance. Each party shall bear its own costs on appeal.
 
 
 49
 In No. 00-57222, the judgment is REVERSED.
 
 
 50
 In No. 01-55321, the judgment is VACATED and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 A three-judge panel can overrule a prior decision of this court when "`an intervening Supreme Court decision undermines an existing precedent of the Ninth Circuit, and both cases are closely on point.'"United States v. Gay, 967 F.2d 322, 327 (9th Cir.1992) (quoting United States v. Lancellotti, 761 F.2d 1363, 1366 (9th Cir.1985)); see also Miller v. Gammie, 335 F.3d 889, 899-900 (2003) (en banc). Duffield and Circuit City, however, are not closely on point. In Duffield, we held that, pursuant to the Civil Rights Act of 1991, Title VII claims are not subject to mandatory arbitration agreements entered into as a condition of employment. 144 F.3d at 1185. Circuit City involved an entirely different issue under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, reserved by the Court in Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), concerning the reach of an exception in the FAA for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in ... interstate commerce," 9 U.S.C. § 1. In Circuit City, the Court held that the exemption applied only to transportation workers and not to employees in interstate commerce in general. 532 U.S. at 109, 121 S.Ct. 1302. In Circuit City, the underlying cause of action was a state employment discrimination claim. Id. at 110, 121 S.Ct. 1302. The case did not involve a claim under Title VII or any other federal employment discrimination statute. Although the Court stated that "arbitration agreements can be enforced under the FAA without contravening the policies of congressional enactments giving employees specific protection against discrimination," id. at 123, Circuit City simply did not address the specific question whether Congress had demonstrated an intent to preclude arbitration of Title VII claims in the text, legislative history, or purpose of the 1991 Act.
 
 
 [2]
 Lagatree actually worked two days without a contract while execution of the contract was pending
 
 
 [3]
 The injunction did not enjoin compulsory arbitration of ADA, ADEA, or EPA claims
 
 
 [4]
 The EEOC did not appeal the district court's ruling that monetary relief was barred by res judicata
 
 
 [5]
 InDuffield, we defined "compulsory arbitration" to apply "when individuals must sign an agreement waiving their rights to litigate future claims in a judicial forum in order to obtain employment with, or continue to work for, the employer." 144 F.3d at 1187.
 
 
 [6]
 InLai, decided under the FAA, two employees of Prudential signed a form that indicated an agreement to arbitrate; however, they were told the document meant something else and were not allowed to read it, and were not given a copy of the arbitration procedure incorporated by the document they signed. 42 F.3d at 1301. The court held that the employees were not bound to arbitrate "because they did not knowingly contract to forego their statutory remedies in favor of arbitration." Id. at 1305.
 
 
 [7]
 We also decline to join inDuffield's leap, equating a purpose to encourage arbitration with a purpose to prohibit compulsory arbitration.
 
 
 [8]
 In particular, inDuffield, we focused on the following language in the Committee Reports:
 The Committee emphasizes . . . that the use of alternative dispute mechanisms is . . . intended to supplement, not supplant, the remedies provided by Title VII. Thus, for example, the committee believes that any agreement to submit disputed issues to arbitration, whether in the context of collective bargaining or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of Title VII. This view is consistent with the Supreme Court's interpretation of Title VII in Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). The Committee does not intend this section to be used to preclude rights and remedies that would otherwise be available.
 . . .
 H.R. 1 includes a provision encouraging the use of alternative means of dispute resolution to supplement, rather than supplant, the rights and remedies provided by Title VII. The Republican substitute, however, encourages the use of such mechanisms "in place of judicial resolution." Thus, under the latter proposal employers could refuse to hire workers unless they signed a binding statement waiving all rights to file Title VII complaints. Such a rule would fly in the face of Supreme Court decisions holding that workers have the right to go to court, rather than being forced into compulsory arbitration, to resolve important statutory and constitutional rights, including equal opportunity rights. See, e.g., Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); McDonald v. City of West Branch, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984). American workers should not be forced to choose between their jobs and their civil rights.
 H.R.Rep. No. 40(I) at 97, 104.
 Other courts, however, have noted that "additional statements by members of Congress expressed the view that section 118 did not preclude binding arbitration." Rosenberg, 170 F.3d at 10 (citing 137 Cong. Rec. S15,472-01, S15,478 (daily ed. Oct. 30, 1991) (statement of Sen. Dole)).
 
 
 [9]
 We also note that not only did Congress not include express statutory language precluding waiver of a judicial forum for Title VII claims, it has subsequently rejected legislation that would have such an effectSee Rosenberg, 170 F.3d at 10 (listing legislative proposals that Congress rejected).
 
 
 
 51
 PREGERSON, Circuit Judge, with whom SCHROEDER, Chief Judge, and REINHARDT, Circuit Judge, join, dissenting in part and concurring in part:[1]
 
 
 52
 I dissent. Congress in enacting the Civil Rights Act of 1991 did not intend that employers could force their employees as a mandatory condition of employment to forego their right to bring future Title VII claims in a court of law. In overruling Duffield v. Robertson Stephens & Co., 144 F.3d 1182 (9th Cir.1998), cert. denied, 525 U.S. 982, 119 S.Ct. 445, 142 L.Ed.2d 399 (1998), the majority opinion allows employers to force their employees to choose between their jobs and their right to bring future Title VII claims in court. That choice is no choice at all.
 
 
 53
 More than three-quarters of a century ago, Andrew Furuseth, then president of the International Seaman's Union of America, said in opposition to the Federal Arbitration Act as originally proposed: "Will such contracts be signed? Esau agreed [to give up his first birthright], because he was hungry. . . . With the growing hunger in modern society, there will be but few that will be able to resist." Proceedings of the 26th Annual Convention of the International Seaman's Union of America 203-04 (1923). This holds true today, if employers are allowed to force their employees, as a condition of employment, to agree to arbitrate their future Title VII civil rights claims and thus give up their statutory right to a jury trial. It was for this reason that in 1991, Congress rejected a "Republican substitute" for § 118 which would have allowed such compulsory arbitration agreements. Congress explained that "American workers should not be forced to choose between their jobs and their civil rights." H.R.Rep. No. 102-40(I), at 104.
 
 I. Duffield Correctly Decided
 
 54
 We reached our holding in Duffield after closely following the Supreme Court's instructions in Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), that involved another federal anti-discrimination law, the Age Discrimination in Employment Act ("ADEA"). In Gilmer, the Supreme Court first reiterated that "`having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.'"[2] 500 U.S. at 26, 111 S.Ct. 1647 (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)). The Supreme Court then placed the burden on the plaintiff employee, who sought to avoid arbitration of his ADEA claim, "to show that Congress intended to preclude a waiver of a judicial forum for ADEA claims." Id. The Supreme Court instructed that congressional intent to preclude arbitration could be found in any one of three sources: "the text of the ADEA, its legislative history, or an `inherent conflict' between arbitration and the ADEA's underlying purposes." Id. The Supreme Court examined the ADEA in this regard and held that the plaintiff "ha[d] not met his burden of showing that Congress, in enacting the ADEA, intended to preclude arbitration of claims under that Act." Id. at 35, 111 S.Ct. 1647.
 
 
 55
 In Duffield, we recited these instructions word for word:
 
 
 56
 "Having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." Mitsubishi,. . . 473 U.S. [at] 628, 105 S.Ct. 3346 . . . . The burden, therefore, is on Duffield to demonstrate that "Congress intended to preclude a waiver of a judicial forum for [Title VII] claims" in the manner mandated by the [securities registration application]. Gilmer, 500 U.S. at 26, 111 S.Ct. 1647 . . . . "If such an intention exists, it will be discoverable in the text of [the act at issue], its legislative history, or an `inherent conflict' between arbitration and the [act's] underlying purposes." Id. at 26, 111 S.Ct. 1647. . . .
 
 
 57
 Duffield, 144 F.3d at 1190. Moreover, we closely followed these instructions in Duffield when we found that "Congress' intent to preclude the compulsory arbitration of Title VII claims is conclusively demonstrated in the text and/or legislative history of the Civil Rights Act of 1991, as well as by an examination of its purposes." Duffield, 144 F.3d at 1189-90; compare with Gilmer, 500 U.S. at 26, 111 S.Ct. 1647.
 
 
 58
 Section 118 of the Civil Rights Act of 1991 provides: "Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including. . . arbitration, is encouraged to resolve disputes arising under [Title VII]." Pub.L. No. 102-166, § 118, 105 Stat. 1071 (1991), reprinted in notes to 42 U.S.C. § 1981 (emphasis added). Regarding the text of § 118, we observed that especially in light of the limiting phrases "[w]here appropriate" and "to the extent authorized by law," "it would seem entirely disingenuous to fasten onto . . . one word," i.e., encouraged, "and conclude that Congress was boundlessly in favor of all forms of arbitration." Duffield, 144 F.3d at 1193. Indeed, because "encourage" indicates voluntariness and "require" indicates involuntariness, Congress' instruction in § 118 that "arbitration . . . is encouraged" if anything seems to contradict the majority's conclusion that arbitration may be required as a condition of employment under Title VII. In Duffield, we concluded that "the text of [§ 118] is, at a minimum, ambiguous," and we then turned to the legislative history of that section. Duffield, 144 F.3d at 1193. Our detailed discussion in Duffield of § 118's legislative history unequivocally supports our holding in that case. Id. at 1195-98.
 
 A. Purpose of § 118
 
 59
 The majority, however, finds that our decision in Duffield was tainted with the "faulty presumption that arbitration undermines the 1991 Act's purpose," maj. op. at 751, and was "inconsistent with the Supreme Court's endorsement of arbitration." Maj. op. at 750. I disagree. Duffield contained no "generalized attacks on arbitration." Maj. op. at 750 (quoting Gilmer, 500 U.S. at 30, 111 S.Ct. 1647). In Duffield, there were no "challenges to the adequacy of arbitration procedures." Gilmer, 500 U.S. at 30, 111 S.Ct. 1647. Rather, as instructed by the Supreme Court in Gilmer, we conducted "a scrupulous examination," Duffield, 144 F.3d at 1189, of the purposes, text, and legislative history of the Civil Rights Act of 1991. The Duffield court recognized "the general federal policy in favor of arbitration." Id. at 1199. But the court further recognized that it was "not free to apply that policy here": "Where Congress has manifested its intent, with regard to arbitration questions and otherwise, the Supreme Court has made it abundantly clear that the judiciary is not free to `legislate' its own contrary preferences." Id. See, e.g., Brogan v. United States, 522 U.S. 398, 408, 118 S.Ct. 805, 139 L.Ed.2d 830 (1998) ("Courts may not create their own limitations on legislation, no matter how alluring the policy arguments for doing so."); Negonsott v. Samuels, 507 U.S. 99, 104, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993) ("[A court's] task is to give effect to the will of Congress [when] its will has been expressed in reasonably plain terms."); Gilmer, 500 U.S. at 26, 111 S.Ct. 1647 (directing courts to follow congressional intent in arbitration context).
 
 
 60
 Contrary to the majority opinion, the "view" of Duffield was not that "compulsory arbitration weakens Title VII," maj. op. at 750, which, of course, would be inconsistent with the Supreme Court's position that arbitration affects only the choice of forum, not substantive rights. Id. (citing EEOC v. Waffle House, Inc., 534 U.S. 279, 296 n. 10, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002)). But rather, the conclusion of Duffield was that by enacting the Civil Rights Act of 1991, Congress did not intend that employers could compel employees to sign compulsory arbitration agreements, coercing employees to arbitrate any future Title VII claim as a condition of their employment. Section 118 of the Civil Rights Act "was intended to help deter employment discrimination by increasing claimants' choice of fora," Duffield, 144 F.3d at 1199 (emphasis in original), not by allowing employers to decrease employees' choice of fora through compulsory arbitration. As noted by the Seventh Circuit, "[i]t would be at least a mild paradox for Congress, having in another amendment that it made to Title VII in 1991 conferred a right to trial by jury for the first time . . . in those same amendments, to prevent workers from obtaining jury trials in these cases." Pryner v. Tractor Supply Co., 109 F.3d 354, 363 (7th Cir.1997) (citation omitted).
 
 
 61
 Moreover, it is the majority's opinion that is inconsistent with the Supreme Court's "endorsement of arbitration." Maj. op. at 750. Inherent within the Supreme Court's "endorsement of arbitration," id., is the essential component of voluntariness. The Court has clearly reiterated that "[a]rbitration under the [FAA] is a matter of consent, not coercion." EEOC v. Waffle House, Inc., 534 U.S. 279, 294, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002) (quoting Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) (emphasis added)). Yet, the majority's holding allows employees to be coerced into signing an arbitration provision as a non-negotiable "take-it-or-leave-it" precondition of employment.[3] Thus, I agree with Duffield's conclusion that there is a conflict between the purposes of Title VII as amended by the Civil Rights Act of 1991 and compulsory arbitration, i.e., requiring an employee to sign a compulsory arbitration agreement as a condition of "taking or keeping a job." Brief for Representatives George Miller et al. as Amici Curiae at 2.
 
 B. Text of § 118
 
 62
 Section 118 provides that alternative dispute resolution methods, such as arbitration, are "encouraged" "[w]here appropriate and to the extent authorized by law."[4] As stated above, "encourage" indicates voluntariness and "require" indicates involuntariness; thus Congress' instruction in § 118 that "arbitration . . . is encouraged" if anything contradicts the majority's conclusion that arbitration may be required as a condition of employment under Title VII. Yet, in part because there is no "prohibitory language" precluding compulsory arbitration, the majority concludes that the text of § 118 does not present any ambiguity suggesting that it may be intended to preclude compulsory arbitration.[5] I disagree.
 
 
 63
 It is true the text of § 118 does not contain "prohibitory language." But the text does contain limiting phrases such as "where appropriate" and "to the extent authorized by law." Furthermore, as we noted in Duffield, "[w]hen `examin[ing] the language of the governing statute,' we must not be guided by `a single sentence or member of a sentence, but look[ ] to the provisions of the whole law, and to its object and policy.'" 144 F.3d at 1193 (quoting John Hancock Mut. Life Ins. Co. v. Harris Trust & Savs. Bank, 510 U.S. 86, 94-95, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993)) (quoting Kelly v. Robinson, 479 U.S. 36, 43, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) (in turn quoting Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 222, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986) (other quotation marks and citations omitted))). "[T]he whole law" and "object and policy," id., of the Civil Rights Act of 1991, and § 118 in particular, "`was uniformly to expand employees' rights and `to increase the possible remedies available to civil rights plaintiffs.'" Duffield, 144 F.3d at 1192 (quoting Prudential Ins. Co. of Am. v. Lai, 42 F.3d 1299, 1304 (9th Cir.1994) (emphasis added in Duffield)). I would conclude, therefore, as we concluded in Duffield, that "the text of [§ 118] is, at a minimum, ambiguous." Duffield, 144 F.3d at 1193.
 
 C. Legislative History of § 118
 
 64
 Because the majority found that the text of § 118 is unambiguous, the majority believes it is precluded from considering the legislative history that "contains[s] language suggesting that Congress intended to retain the judicial forum." Maj. op. at 752. Assuming for the purposes of argument, that the majority opinion is correct and that the text of § 118 is unambiguous, the majority, nonetheless, errs in refusing to consider the legislative history of § 118. "We must assume that if Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history." Mitsubishi, 473 U.S. at 628, 105 S.Ct. 3346 (emphasis added). According to Gilmer's directives, followed in Duffield, Congress' intention will be discoverable in any one of three sources: "the text of [the statute], its legislative history, or an `inherent conflict' between arbitration and the [statute's] underlying purpose." Gilmer, 500 U.S. at 26, 111 S.Ct. 1647 (emphasis added). The majority, however, overlooks Gilmer's instructions and treats this case as a general case of statutory interpretation. See maj. op. at 752 ("Because the text of § 118 is unambiguous, we are precluded from considering legislative history.").
 
 
 65
 Had the majority properly given credence to the legislative history, it would have concluded, as we concluded in Duffield, that "it is the unusual force and clarity of the statute's legislative history that is ultimately dispositive in this case." Duffield, 144 F.3d at 1195. The majority cites the following language from the Committee Reports:
 
 
 66
 The Committee emphasizes . . . that the use of alternative dispute mechanisms is . . . intended to supplement, not supplant, the remedies provided by Title VII. Thus, for example, the committee believes that any agreement to submit disputed issues to arbitration, whether in the context of collective bargaining or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of Title VII. This view is consistent with the Supreme Court's interpretation of Title VII in Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). The Committee does not intend this section to be used to preclude rights and remedies that would otherwise be available.
 
 
 67
 Maj. op. at 752 n. 8 (quoting H.R.Rep. No. 40(I) at 97) (emphasis added). "In surveying legislative history, [the Supreme Court has] repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which `represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying the proposed legislation.'" Duffield, 144 F.3d at 1195 (quoting Garcia v. United States, 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) (in turn quoting Zuber v. Allen, 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969))).
 
 
 68
 In the Committee Report, Congress specifically rejected a proposal that would have allowed employers to coerce their employees to sign compulsory arbitration agreements: H.R. 1 includes a provision encouraging the use of alternative means of dispute resolution to supplement, rather than supplant, the rights and remedies provided by Title VII. The Republican substitute, however, encourages the use of such mechanisms "in place of judicial resolution." Thus, under the latter proposal employers could refuse to hire workers unless they signed a binding statement waiving all rights to file Title VII complaints. Such a rule would fly in the face of Supreme Court decisions holding that workers have the right to go to court, rather than being forced into compulsory arbitration, to resolve important statutory and constitutional rights, including equal opportunity rights. See, e.g., Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); McDonald v. City of West Branch, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984). American workers should not be forced to choose between their jobs and their civil rights.
 
 
 69
 H.R.Rep. No. 40(I), at 104. See Thompson v. Thompson, 484 U.S. 174, 185, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988) (Congress' choice of several conflicting proposals provides "strong evidence" of its intent).
 
 As we stated in Duffield:
 
 70
 This rejection of the "Republican" proposal provides . . . "strong evidence" of Congress' intent, Thompson, 484 U.S. at 185, 108 S.Ct. 513, to preclude compulsory arbitration of civil rights claims and to "encourage" only voluntary agreements — agreements that do not require potential employees to waive their right to litigate in a judicial forum as a mandatory condition of employment. . . . The [House] Committee [on Education and Labor]'s view of § 118 was reiterated by key congressmen in the floor debates, who repeatedly stated that § 118 encouraged arbitration only "where parties knowingly and voluntarily elect to use those methods." 137 Cong. Rec. S15478 (daily ed. Oct. 30, 1991) (statement of Sen. Dole); see also 137 Cong. Rec. H9548 (daily ed. Nov. 7, 1991) (statement of Rep. Hyde) (explaining that § 118 encourages arbitration where "the parties knowingly and voluntarily elect" to submit to such procedures). The most informed and important statements were made by Representative Edwards, the Chairman of the House Committee on Education and Labor. Representative Edwards unequivocally explained during the debate immediately prior to the [Civil Rights] Act [of 1991]'s passage . . .:["]This section contemplates the use of voluntary arbitration. . ., not coercive attempts to force employees in advance to forego statutory rights. No approval whatsoever is intended of the Supreme Court's recent decision in Gilmer . . . or, any application or extension of it to Title VII.["][137 Cong. Rec. H9530 (daily ed. Nov. 7, 1991) (statement of Rep. Edwards)] (emphasis added). Finally, President Bush echoed Congress' understanding of the arbitration section in signing the Act, stating that "section 118 encourages voluntary agreements between employers and employees to rely on alternative mechanisms such as mediation and arbitration." Statement of the President of the United States, Signing Ceremony, Pub.L. No. 102-166 (Nov. 21, 1991), reprinted in 1991 U.S.C.C.A.N. 768, 769 (emphasis added).
 
 
 71
 Duffield, 144 F.3d at 1196-97 (footnote omitted).
 
 
 72
 There can be little doubt in the correctness of the conclusion by the Duffield court that arbitration agreements required by employers of their employees as a condition of employment are not "voluntary arbitration agreements between employers and employees" as envisioned by Congress for Title VII. Because our discussion in Duffield of § 118's legislative history unequivocally supports our holding in that case, I would hold that Duffield was, and remains, good law.
 
 II. Conclusion
 
 73
 In overruling Duffield, the majority opinion fails to interpret the Civil Rights Act of 1991 "in a manner consistent with Congress's original intent to expand protections against workplace discrimination, and of particular relevance to this case, to preclude employers from forcing employees, as a condition of taking or keeping a job, to agree to arbitrate future Title VII claims." Brief for Representatives George Miller et al. as Amici Curiae at 2. The majority also fails to follow Congress' explicit directions to read the 1991 Act broadly so as to best effectuate its remedial purposes: "In codifying this rule of construction, Congress intends that when the statutory terms in civil rights law are susceptible to alternative interpretations, the courts are to select the construction which most effectively advances the underlying congressional purpose of that law." H.R.Rep. No. 40(II), at 34. As the majority correctly notes the underlying purpose behind the 1991 Act was "to restore civil rights limited by then-recent Supreme Court decisions and to `strengthen existing protections and remedies available under federal civil rights laws to provide more effective deterrence and adequate compensation for victims of discrimination.'" Maj. op. at 747 (quoting H.R.Rep. No. 40(II), at 1). The underlying purpose was not to allow employers to shove arbitration provisions down the throats of individual employees as a non-negotiable precondition of employment. But sadly that is the consequence of the majority's holding.
 
 
 74
 I dissent.
 
 
 
 Notes:
 
 
 [1]
 I agree with the majority that the EEOC's retaliation claim should be addressed by the district court on remand. I also agree thatCircuit City Stores, Inc. v. Adams, 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001), did not implicitly overrule Duffield v. Robertson Stephens & Co., 144 F.3d 1182 (9th Cir.1998). My dissent concerns the majority's error in overruling Duffield which I maintain was correctly decided. I would hold that Duffield remains good law.
 
 
 [2]
 Donald Lagatree, however, made no "bargain to arbitrate."Gilmer, 500 U.S. at 26, 111 S.Ct. 1647 (quoting Mitsubishi, 473 U.S. at 628, 105 S.Ct. 3346). Luce Forward fired him when he refused to sign a compulsory arbitration agreement. This is the real issue in this case: whether Luce Forward inappropriately retaliated against Lagatree. As the EEOC repeatedly emphasized in its original briefs and at oral argument, Lagatree's claim never rested on a reaffirmation of Duffield's holding that compulsory arbitration agreements are unenforceable under Title VII. The EEOC proffered only a retaliation theory, and specifically stated that there was no reason to address the viability of Duffield to evaluate its argument.
 
 
 [3]
 The majority states that "[a]lthough,Duffield distinguished compulsory from voluntary arbitration, we now join several other circuits in concluding, pursuant to Gilmer, that the right to jury trial presents no bar to compulsory arbitration." Maj. op. at 751. That statement contorts Duffield.
 In Duffield, we found — based upon our study of the purposes, text, and legislative history of the Civil Rights Act of 1991 — that Congress did not intend to require employees to submit their future Title VII claims to arbitration as a condition of employment. Our holding was not based on the right to a jury trial for Title VII claims provided by the Civil Rights Act of 1991; instead, giving heed to Gilmer's directives, our holding — as recognized by the majority, maj. op. at 751 — was based on the purpose, text, and legislative history of Civil Rights Act of 1991 and § 118 in particular.
 Furthermore, in Duffield, we did not use the term "compulsory arbitration" as it is traditionally defined. See Black's Law Dictionary 100 (7th ed.1999) (defining "compulsory arbitration" as "[a]rbitration required by law or forced by law on the parties"). "Compulsory arbitration," both as we used that term in Duffield and as it is traditionally defined, must furthermore be distinguished from "mandatory arbitration." See, e.g., Koveleskie v. SBC Capital Mkts., Inc., 167 F.3d 361, 362 (7th Cir.1999) (employing the term "mandatory arbitration" to reflect "the contractual situation where if one party to a dispute requests arbitration, the other party is obliged to arbitrate"). The Supreme Court stated the question presented in Gilmer as "whether a claim under the [ADEA] can be subjected to compulsory arbitration pursuant to an arbitration agreement in a securities registration application." 500 U.S. at 23, 111 S.Ct. 1647. But the Supreme Court did not use the term "compulsory" in the sense given to that term in Duffield, i.e., requiring an employee to sign an arbitration agreement as a condition of employment. Rather in Gilmer, the Supreme Court used the term "compulsory" in the sense of "mandatory," i.e., contractually required. And while the arbitration provision at issue in Gilmer was indeed required as a condition of employment, this was not made an issue by the Supreme Court, which held more generally that the plaintiff "ha[d] not met his burden of showing that Congress, in enacting the ADEA, intended to preclude arbitration of claims under that Act." Gilmer, 500 U.S. at 35, 111 S.Ct. 1647.
 
 
 [4]
 We noted inDuffield that "[i]t would also be a mild paradox to interpret § 118 as encouraging compulsory arbitration, when the section's other `encouraged' types of alternative dispute — `settlement negotiations, conciliation, facilitation, mediation, factfinding,[and] minitrials' — are all consensual." 144 F.3d at 1193 n. 13. See also Brief for Representatives George Miller et al. as Amici Curiae at 4-5:
 The plain intent of this clause was to encourage voluntary alternative dispute resolution methods, not mandatory arbitration made a condition of employment. To begin with, except for arbitration (and perhaps minitrials) each of the ADR methodologies mentioned is non-binding . . . . Arbitration (and minitrials, to the extent those involve a binding dispute resolution process) necessarily refers to submission agreements made voluntarily . . ., in marked contrast to predispute agreements made a non-negotiable condition of employment. Understanding this reference to arbitration to include mandatory arbitration would be precluded, among other things, by the statutory interpretation principle of noscitur a sociis ("a word is known by the company it keeps").
 See, e.g., Gutierrez v. Ada, 528 U.S. 250, 255, 120 S.Ct. 740, 145 L.Ed.2d 747 (2000), quoting Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961) (maxim noscitur a sociis, . . . while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breath to the Acts of Congress").
 
 
 [5]
 The majority also finds that "the legal landscape encompassed by the phrase, `to the extent authorized by law,' must also include the FAA." Maj. op. at 752. The majority states that "[t]his aspect of the law also incorporated the `liberal federal policy favoring arbitration agreements.'"Id. at 752 (quoting Moses H. Cone Mem'l Hosp., 460 U.S. at 24, 103 S.Ct. 927). Yet, the majority fails to acknowledge that this aspect of the law also incorporates the Supreme Court's pronouncement that "[a]rbitration under the [FAA] is a matter of consent, not coercion." Waffle House, 534 U.S. at 294, 122 S.Ct. 754 (quoting Volt Info. Scis., Inc., 489 U.S. at 479, 109 S.Ct. 1248) (emphasis added).
 
 
 
 75
 REINHARDT, Circuit Judge, with whom PREGERSON, Circuit Judge, joins, dissenting:
 
 
 76
 While I join Judge Pregerson's dissent fully, I write separately to emphasize two points.
 
 
 77
 1. In 1991, Congress decided it would no longer tolerate the federal judiciary's assault on Title VII of the Civil Rights Act of 1964. Motivated by a series of highly conservative Supreme Court decisions that "seriously undermine[d] the effectiveness of Title VII," H.R.Rep. No. 40(I) at 80, reprinted in 1991 U.S.C.C.A.N. 549, Congress adopted, and the first President George Bush signed, the Civil Rights Act of 1991. In that Act, Congress took the extraordinary step of explicitly overturning several Supreme Court decisions — decisions "Congress thought represented an unduly narrow and restrictive reading of Title VII," Duffield v. Robertson Stephens & Co., 144 F.3d, 1182, 1190 (9th Cir.1998) — and replacing them with statutory provisions designed to protect the civil rights of American workers. Among those provisions was one that for the first time gave working men and women the right to trial by jury in Title VII race and sex discrimination cases. Civil Rights Act of 1991, § 102(c), 42 U.S.C. § 1981a(c). It also directed the federal courts to apply particular legal standards, protective of their rights, when such claims were litigated in the federal courts.
 
 
 78
 The battle to secure the right to a jury trial in employment discrimination cases was long and hard fought. Congress failed to provide the right to a jury trial in 1964 when Title VII was first enacted, and subsequent Congresses rejected amendments that would have done so. When the 1991 Civil Rights bill with its provision for jury trials came before Congress, there was considerable opposition to the proposal. Up until the moment the Senate defeated a Republican substitute measure to allow employers to force compulsory arbitration on workers, the right to a jury trial in Title VII cases remained in doubt. Today, this en banc court enacts the failed Republican substitute, and by judicial action effectively deprives American workers of their hard-won legislative victory.
 
 
 79
 At the time Congress adopted the jury trial provisions of the 1991 Act and afforded victims of race and sex discrimination the remedy they had so long sought, it added a section that encourages the use of arbitration in appropriate circumstances. But Congress qualified its encouragement, explicitly instructing courts not to interpret its approval of some arbitration "to preclude rights and remedies that would otherwise be available." H.R.Rep. No. 40(1), at 97. Indeed, as Judge Pregerson irrefutably argues in dissent, Congress always intended arbitration to supplement, not supplant, jury trials. Today the majority announces precisely the type of callous anti-civil rights, pro-employer decision that Congress condemned when it enacted the Civil Rights Act of 1991; its decision transforms Congress's cautious and partial encouragement of arbitration into an unequivocal and all-encompassing invitation to employers to refuse to hire, and even to fire, workers who wish to exercise their jury trial rights. It makes no sense that Congress would have given civil rights victims their much desired victory only to have taken it away from them in the very same bill. Yet that is what the majority concludes. In doing so, my colleagues continue the current judicial trend of closing the doors to the federal courts to those who most need our protection. This time the majority closes those doors to employees against whom employers discriminate on the basis of race or sex.
 
 
 80
 Regrettably, my colleagues in the majority have joined a number of other circuits in rewriting Title VII's mandates to comport with the judiciary's historic disregard for workers' rights and its elitist preference for fewer jury trials and less crowded appellate dockets. It is ironic that today's decision eliminates an important protection that Congress enacted when overturning anti-civil rights decisions of the very type we announce today. This time we hold that employers may compel their employees to surrender their rights to jury trial in race and sex discrimination cases; and that those who refuse to do so may be consigned to welfare or worse. Contrary to the views of the majority, this is surely not what Congress intended when it finally granted civil rights plaintiffs the right to a jury trial.
 
 
 81
 2. The majority claims that this case can be decided by looking to a few unambiguous words in a federal statute. It cannot. Despite repeated assurances to the contrary, the majority does not engage in a simple or obvious construction of the Civil Rights Act of 1991. Rather, my colleagues gloss over the unmistakable ambiguity of the 1991 Act's text and characterize it as if the words directly foreclose the result we reached in Duffield. This effort amounts to little more than sophistry — the text does no such thing.
 
 
 82
 Here is the text that my colleagues contend states unambiguously that employers may force their workers to sign compulsory arbitration agreements or lose their opportunities for employment: "Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including . . . arbitration, is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this title." Pub.L. No. 102-166 § 118, 105 Stat. 1071 (codified at Notes to 42 U.S.C. § 1981). Duffield did not dispute that employers could use arbitration in a variety of different circumstances; nor do I now. The relevant questions are when and how Congress intended to encourage the use of arbitration. Nowhere, of course, do the words mandatory or compulsory arbitration appear. The plain meaning of this statutory text is that Congress offered its encouragement to arbitration only when two conditions are met: in "appropriate" circumstances, and when legally authorized. I shall come later to the question of what Congress thought constituted an appropriate use of arbitration.
 
 
 83
 With respect to the phrase "the extent authorized by law," all seem to agree that the text refers to Congress's understanding of the law at the time. The majority asserts that Congress thought that compulsory arbitration agreements in general were authorized by law. My colleagues reach this conclusion almost entirely on the basis of a Supreme Court case decided shortly before the passage of the 1991 Civil Rights Act. See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (interpreting the Age Discrimination in Employment Act (ADEA) and holding that the Act did not preclude employers' use of compulsory arbitration agreements with respect to age discrimination). The majority infers from the mere existence of this case that Congress (a) knew of it; (b) agreed with it; and (c) intended to incorporate into an act designed to combat race and sex discrimination the Court's interpretation of an act regulating age discrimination.
 
 
 84
 In its effort to show that Congress actually considered Gilmer, the majority retreats to a legal fiction that is directly contrary to the facts: Congress, my colleagues say, "surely became aware[, in the few months between the Gilmer decision and the 1991 Act's passage,] that Gilmer, and not Alexander, provided the Supreme Court's prevailing assessment of employment arbitration agreements." Supra at 752. This argument is wrong for two principal reasons. First, all of the official written legislative history, in the form of two years worth of committee hearings and official committee reports, was written before Gilmer was decided on May 13, 1991.[1] As Duffield explained, and as Judge Pregerson's dissent demonstrates, even a cursory search through the painstakingly thorough legislative history demonstrates Congress's belief that arbitration schemes such as the one at issue here were illegal under the law it perceived to be controlling.[2] Second, despite Gilmer's seemingly obvious relevance to the Act, the majority is unable to point to a single statement in the statutory text or legislative history demonstrating Congress's recognition that Gilmer was controlling, or for that matter that it had been decided. Surely, if Gilmer were as obviously relevant to the meaning of the Act as the majority asserts it is, Congress would have mentioned the legal standard adopted by the case.
 
 
 85
 The majority's assertion that Gilmer obviously defined the meaning of "authorized by law" in the 1991 Act is equally erroneous. Even though the language describing the remedy is the same in Title VII as it was in the ADEA, the levels of protection sought to be achieved by the two statutes are different. As the Supreme Court has recently recognized, statutes regulating race and gender discrimination implicate much graver constitutional concerns than statutes dealing with the disabled or the elderly, see Nev. Dep't of Human Res. v. Hibbs, ___ U.S. ___, ___ _ ___, 123 S.Ct. 1972, 1981-82, 155 L.Ed.2d 953 (2003). Thus, it would be no surprise if Congress were to enact more robust statutory protections for individuals threatened by race and gender discrimination.
 
 
 86
 Moreover, even assuming that the majority's assumption were true, it is worth noting that the assumption by necessity recognizes that the meaning of the statute cannot be deduced through its words alone. Faced with words ("authorized by law") that by themselves do not lead to obvious and immediate conclusions, the majority has turned to contemporaneous evidence — in the form of a perceived congressional reaction to a Supreme Court case — in order to add context to words that without context are unquestionably ambiguous. Yet the majority pretends that it has merely picked up the statute, read those words, and come to an obvious and undeniable conclusion.
 
 
 87
 The majority's suggestion that the plain meaning of the 1991 Act compels its conclusion is plainly absurd. This is not a case in which the majority has looked to other parts of the statute to determine statutory coherence; the majority cites none of the traditional canons of statutory construction. Instead, solely by virtue of its assumption — without any supporting evidence — that Congress intended to incorporate the legal standard adopted in Gilmer, my colleagues today decide that the words "authorized by law" are completely unambiguous in a bill designed to protect workers against race and sex discrimination. In truth, there can be no doubt that the majority is inferring meaning about ambiguous words in a text by examining historical context. In such circumstance, the numerous cases cited in the majority opinion, all of which forbid courts from searching for additional context when confronted by plain meaning, are simply inapposite.[3] If judges may guess as to what Congress might have thought about a particular Supreme Court case, we surely may not ignore what members of Congress and official committee reports actually said about those cases in the legislative history.[4]
 
 
 88
 Even worse is the manner in which the majority has distorted Gilmer to reach its result. According to the majority, Gilmer created a specific method by which Congress could outlaw compulsory arbitration agreements. Congress, they say, simply failed to add the necessary statutory text. See also Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc., 191 F.3d 198, 205-06 (2d Cir.1999) (noting that Congress knew how to preclude waivers of judicial remedies in the statutory text and did not, and that "the absence of that language is a meaningful omission"). It is, no doubt, true that Gilmer did specify how Congress could preclude the use of compulsory arbitration agreements. But it is not true that the Gilmer Court required Congress to speak magic words — no reasonable legislator would have read Gilmer as suggesting that writing certain words into the statutory text was essential in order to preclude waivers of a federal judicial forum. To the contrary, Gilmer's inquiry was solely about congressional intent — an inquiry distinct from a search for literal textual meaning or for the original understanding of the words — and the Court was unambiguous about what evidence is relevant to a determination of congressional intent. "If such an intention exists, it will be discoverable in the text of the [Act], its legislative history, or an `inherent conflict' between arbitration and the [Act's] underlying purposes." Gilmer, 500 U.S. at 26, 111 S.Ct. 1647. I must here emphasize what should be obvious from this passage: the Supreme Court in Gilmer told Congress that it could use legislative history to express its intent to preclude waiver of a judicial forum.
 
 
 89
 Assuming for a moment that Congress had learned of Gilmer by the time the Committee Reports were written, then one would have to examine the Act's exhaustive legislative record to determine whether Congress had responded to the Court's invitation to express its intent via legislative history. Duffield quoted the legislative history at length, as does Judge Pregerson's dissent. I do not wish to repeat material cited in either. But there is one passage worth reexamining now that it is plain that the Court invited Congress to prohibit compulsory arbitration either through the text of the statute or by clarifying statutory text in the legislative history.
 
 
 90
 H.R. 1 includes a provision encouraging the use of alternative means of dispute resolution to supplement, rather than supplant, the rights and remedies provided by Title VII. The Republican substitute, however, encourages the use of such mechanisms "in place of judicial resolution." Thus, under the latter proposal employers could refuse to hire workers unless they signed a binding statement waiving all rights to file Title VII complaints. Such a rule would fly in the face of Supreme Court decisions holding that workers have the right to go to court, rather than being forced into compulsory arbitration, to resolve important statutory and constitutional rights, including employment opportunity rights. See, e.g., Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); McDonald v. City of West Branch, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984). American workers should not be forced to choose between their jobs and their civil rights.
 
 
 91
 102 H. Rpt. 40(I), at 104 reprinted in 1991 U.S.C.C.A.N. 549, 553-54. It would be difficult to imagine a clearer expression of legislative intent. Far from viewing the Gilmer standard as governing in Title VII cases, and far from agreeing with the Supreme Court's later pronouncements that arbitration is substantively no different from resolution of claims in a judicial forum, the majority in Congress who voted for the 1991 Civil Rights Act plainly thought that the Act did not allow employers to force their workers to sign compulsory arbitration clauses forfeiting their right to trial by jury in Title VII cases.
 
 
 92
 My colleagues may not like legislative history. They may agree with various academics that what Congress intended is irrelevant to determining the meaning of what Congress said. No matter, for the point on which the majority, Judge Pregerson, and I all seem to agree is that the Gilmer Court told Congress how to express its intent. The majority opinion asserts that Congress knew of Gilmer, yet pretends that the Court's invitation to specify intent through legislative history never existed. Acting in a manner that accords fully — even if unwittingly — with Gilmer's instructions, Congress used its official committee reports (agreed upon by majority votes in the authoring committees) to declare unambiguously that Title VII does not permit employers to force their workers to sign compulsory arbitration clauses as a condition of employment. Such was our holding in Duffield. Today, the majority overrules Duffield by reading out of Gilmer the portion that instructed Congress to consider both statutory text and legislative history as possible sources of intent. The majority's reliance on one part of Gilmer and utter disregard of another may be a necessary step in its mystifying interpretive routine, but it is no way to make good law.
 
 
 93
 Even if Congress thought that compulsory arbitration agreements were authorized by law, we must still inquire whether Congress thought that it was appropriate to allow employers to demand such agreements from all employees. The majority appears to believe that these two questions are coterminous. They are not. We must give meaning to all words in the statute, not just the ones that support our chosen result. And certainly it is at least plausible that Congress believed that certain types of agreements were constitutional and legal under acts like the Federal Arbitration Act yet still not appropriate if for use with respect to Title VII claims. Indeed, had Congress desired to authorize all arbitration authorized by law, it would not have needed to include the word "appropriate" at the start of § 118.
 
 
 94
 It is utterly implausible that Congress considered it appropriate to encourage the system the majority approves today — a system in which no applicant will be able to get a job unless he first signs away his rights to pursue a Title VII claim in the federal courts. It simply makes no sense to assume that Congress went through the trouble of finally granting workers their hard won right to trial by jury only then, in the same bill, to render that provision nugatory by authorizing employers to require all potential employees to forfeit that right and choose between a job and access to the federal courts. Indeed, it seems obvious to me that Congress perceived compulsory arbitration to be entirely inappropriate for claims of employer discrimination on the basis of race or sex.
 
 
 95
 We held in Duffield that any measure of "appropriateness" must consider the overall purposes of the Act. The majority casts aside those purposes, accusing the Duffield Court of resting its decision on "the faulty presumption that arbitration undermines the 1991 Act's purpose." This is simply not true. Duffield did not arise out of distrust of arbitral forums or of federal arbitrators. Rather, Duffield's holding had its genesis in Congress's unmistakable desire to expand, rather than to contract, the remedies available to workers under the nation's civil rights laws. See Duffield, 144 F.3d at 1192 (noting that Congress demonstrated a clear preference "to expand employees' rights and `to increase the possible remedies available to civil rights plaintiffs'"). Even if the decisions of arbitral fora were substantively identical to those in the federal courts, the mere approval of compulsory arbitration agreements decreases the options available to employees under the Act. Moreover, Duffield did not rule out the use of voluntary arbitration agreements, or even of compulsory arbitration agreements in appropriate circumstances. All Duffield held illegal was the practice of requiring current or potential employees to choose between a job and statutorily guaranteed rights.
 
 
 96
 It is no answer to say that requiring arbitration does not affect workers' "substantive rights." Indeed, the question whether arbitration is a more or less effective forum than the federal courts through which to pursue discrimination claims is immaterial. The point we made in Duffield, a point which is no less true today than it was then, is that federal courts may not allow employers to eliminate a right — even a procedural right — guaranteed by Title VII simply because of a general federal policy favoring the resolution of some disputes via arbitration. This would be true even if the procedural right were not deemed important both by Congress and the victims of racial and sexual discrimination to whose benefit it inured. And even if one thinks that compulsory arbitration was "authorized by law" in 1991, there is no support for the claim that Congress thought that arbitration agreements were "appropriate" when they forced victims of discrimination to give up the right of access to the federal courts.
 
 
 97
 By allowing employers to require all workers to enter into compulsory arbitration agreements, the majority today erases the choice-enhancing aspects of the 1991 Act that Congress enacted to overturn regressive judicial decisions such as today's. What is more, the majority has discarded the only interpretation of Title VII that can honestly claim to construe faithfully the statute's language in accordance with Congress's will. And it has done so despite Congress's explicit instruction to interpret statutory terms "susceptible to alternative interpretations. . . [by] select[ing] the construction which most effectively advances the underlying congressional purpose." H.R.Rep. No. 40(I) at 88. My colleagues today inexplicably emulate the same type of statutory revisionism that provoked Congress in 1991 to do what it does on only the rarest of occasions — overturn decisions of our nation's highest Court.
 
 
 98
 Today's decision by this en banc court constitutes a wilful judicial rebuke of Congress's effort to protect the rights of American workers to trial by jury in race and sex discrimination cases. Contrary to the clear will of Congress, my respected colleagues invite employers to discharge (and/or not to hire) any woman, or any African American, Hispanic, Native American, or other minority group member, who has the courage to refuse to surrender his hard won right to confront, and thereby hold liable, his persecutor in the federal courts. After today, we have a little less of a dream. I dissent.
 
 
 
 Notes:
 
 
 [1]
 See, e.g., S. REP. No. 101-315 (June 8, 1990); H.R.REP. No. 101-644(I) (July 30, 1990); H.R. REP. No. 101-644(II) (July 31, 1990); H.R. REP. No. 101-755 (Sept. 26, 1990); H.R. REP. No. 101-856 (Oct. 12, 1990); H.R. REP. No. 102-40(I) (Apr. 24, 1991); H.R. REP. No. 102-40(II) (May 17, 1991). Only the last of these reports was published after Gilmer came down, and it is certain that it was written long before the Gilmer slip opinion made its way to Capitol Hill.
 
 
 [2]
 That case wasAlexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (holding that an arbitration clause in a collective-bargaining agreement did not preclude a worker from bringing an individual Title VII claim in federal court).
 
 
 [3]
 Desert Palace, Inc. v. Costa, ___ U.S. ___, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), for instance, interpreted the word "demonstrates" in the 1991 Civil Rights Act. The Court looked to the statutory definition of the word "demonstrates" in the Act and several other uses of the word inside of the same statute to determine that its meaning was unambiguous. Ratzlaf v. United States, 510 U.S. 135, 148, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), involved the phrase "willfully violating," words that could be best understood by looking to other parts of the statute and to the long tradition of interpreting mens rea requirements. Even Circuit City Stores v. Adams, 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001), at least applied a few canons of statutory construction before dismissing the legislative history. None of those cases is remotely like this one; in none did the majority transform ambiguous text into certain command in order to disregard unambiguous legislative history.
 
 
 [4]
 It is sometimes argued that committee reports and floor statements by individual members of Congress are not democratically approved by a majority of Congress. But the majority does not make this argument here. Nor could it; for examining the legislative history asevidence of congressional intent is far more democratic than imposing our own view of how Congress might have interpreted a Supreme Court case. Committee reports in particular are the product of democratic compromise; they require a vote by majority and allow for expressions of concurrence and dissent. "In surveying legislative history[, the Supreme Court has] repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which `represent the considered and collective understanding of those [members of Congress] involved in drafting and studying proposed legislation.'" Eldred v. Ashcroft, 537 U.S. 186, 123 S.Ct. 769, 784 n. 16, 154 L.Ed.2d 683 (2002) (quoting Garcia v. United States, 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984)).